J-A19025-20

2021 PA Super 48

| | | |
|---|---|---|
| KEITH SPENCER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CLEVELAND JOHNSON, TINA GAINER | : | No. 2011 EDA 2019 |
| JOHNSON, AND PHILADELPHIA | : | |
| JOINT BOARD WORKERS UNITED, | : | |
| SEIU | | |

Appeal from the Order Entered April 23, 2019
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  August Term, 2016 No. 2136

| | | |
|---|---|---|
| KEITH SPENCER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CLEVELAND JOHNSON; TINA GAINER | : | |
| JOHNSON AND PHILADELPHIA JOINT | : | |
| BOARD WORKERS UNITED, SEIU | : | No. 2036 EDA 2019 |
| | : | |
| | : | |
| APPEAL OF: TINA GAINER JOHNSON | : | |

Appeal from the Judgment Entered May 17, 2019
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  August Term, 2016 No. 2136

| | | |
|---|---|---|
| KEITH SPENCER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CLEVELAND JOHNSON, TINA GAINER | : | No. 2040 EDA 2019 |
| JOHNSON, AND PHILADELPHIA | : | |

J-A19025-20

JOINT BOARD WORKERS UNITED,    :
SEIU

Appeal from the Order Entered April 23, 2019
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  August Term, 2016 No. 2136

| KEITH SPENCER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CLEVELAND JOHNSON AND TINA | : | |
| GAINER JOHNSON AND | : | |
| PHILADELPHIA JOINT BOARD | : | No. 2080 EDA 2019 |
| WORKERS UNITED, SEIU | : | |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA JOINT | : | |
| BOARD WORKERS UNITED, SEIU | : | |

Appeal from the Order Dated April 23, 2019
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s):  August Term, 2016, No. 2136

BEFORE:    PANELLA, P.J., McLAUGHLIN, J.,[*] and McCAFFERY, J.

OPINION BY PANELLA, P.J.:                    Filed: March 18, 2021

This consolidated appeal arises out of an automobile accident that occurred in West Philadelphia, Pennsylvania. On October 16, 2014, the car that Cleveland Johnson ("Cleveland") was driving struck Appellant/Cross-Appellee, Keith Spencer ("Spencer"), a pedestrian, as he lawfully crossed the street. Spencer suffered permanent, debilitating injuries, which have severely

_____

[*] Judge McLaughlin did not participate in the consideration or decision of this case.

- 2 -

diminished his quality of life. Central to this appeal is the extent to which the owner of the car that Cleveland was driving should be held liable for Spencer's injuries. The owner, Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU ("PJB"), provided the car to its employee, Appellee/Cross-Appellant, Tina Johnson ("Tina"), who is Cleveland's wife.[1]

The parties do not dispute two facts: (1) Spencer was not at fault, and (2) Cleveland was negligent in his operation of the vehicle. However, the parties disagree as to whether Tina was negligent in allowing Cleveland to operate her work vehicle, and whether PJB was negligent under the laws of agency and vicarious liability in failing to maintain reasonable policies and regulations for the vehicles it provides to employees like Tina.

As will be discussed in detail below, Spencer instituted a civil action against Cleveland, Tina, and PJB, and the matter eventually went to trial. The jury found that all three defendants shared liability for Spencer's injuries, and apportioned that liability among the defendants. Spencer sought to mold the verdict to make PJB jointly and severally liable[2] for Tina's negligence. The trial

---

[1] On August 15, 2019, this Court entered an order, *sua sponte*, consolidating the appeals as cross-appeals. Spencer was designated as Appellant/Cross-Appellee. Tina and PJB were designated as Appellees/Cross-Appellants. **See** Pa.R.A.P. 2136. Cleveland did not file a notice of appeal, and is not a party to this present matter.

[2] The Pennsylvania Supreme Court defines joint and several liability as follows: "Under the doctrine of joint and several liability, where there is more than one defendant, an injured party may seek to recover his or her entire judgment

court denied Spencer's request. Because we conclude that Spencer is legally entitled to this relief, we are constrained to reverse the trial court's denial of Spencer's post-trial motion to mold the verdict, and we consequently remand for further proceedings.

The essential facts relevant to this appeal are largely undisputed.[3] Where there are factual disputes between the parties, we will highlight them. However, one of the parties' primary disputes concerns the legal consequences of PJB's act in providing Tina with a car. PJB is small labor union organization that covers the Philadelphia and South Jersey areas. Tina initially volunteered at the union when she worked at an airport magazine shop, but later became a fulltime, paid employee.

In 2012, PJB provided Tina with a company car, a 2009 silver Ford Escape, because PJB considered these vehicles "absolutely essential to the

---

from either of the defendants." **AAA Mid-Atlantic Ins. Co. v. Ryan**, 84 A.3d 626, 628 n.1 (Pa. 2014). Moreover, the Supreme Court has further stated, "Joint and several liability as a principle of recovery for an indivisible injury caused by multiple tortfeasors lies at the very heart of the common law of tort, and also has a solid foundation in Pennsylvania's statutory law." **Carrozza v. Greenbaum**, 916 A.2d 553, 565 (Pa. 2007). **See also Glomb v. Glomb**, 530 A.2d 1362, 1365 (Pa. Super. 1987) ("Imposition of joint and several liability enables the injured party to satisfy an entire judgment against any one of the tort-feasors, even if the wrongdoing of that tortfeasor contributed only a small part to the harm inflicted.").

[3] The relevant facts and procedural history of this complex case are gleaned from the certified record and the trial court's Rule 1925(a) opinion, which no party disputes.

- 4 -

work of organizers and business representatives" since "employees could be required to drive out to job sites at any hour of day or night, twenty-four hours a day." Trial Court Opinion, 6/24/2019, at 5 (internal quotations marks omitted).[4] The car was considered part of the job so unless someone proved "unfit," the employee would be given a car. N.T., 1/22/2019 p.m., at 51.

PJB's main requirement for providing a company car was that the employee must have a valid driver's license. **See** Trial Court Opinion, 6/24/2019, at 5. PJB also considered the employee's past performance, her reputation, and her work ethic. **See id.**

PJB's chief of staff at the time was Richard Minter.[5] Minter stated that employees are not "automatically given a car on day one, and that PJB vetted its employees by making them prove their credibility through their work performance and history." **Id.**, at 4 n.1 (quotation marks omitted). Minter communicated that "the process was complex and was not taken lightly, but provided no other details about the process other than running the driver's license." **Id.** (record citation and quotation marks omitted).

---

[4] PJB provided six of its seven staff members with company cars.

[5] At the time of the incident, Minter was the chief of staff and organizer director for PJB. He oversaw the work of the staff and the organization of projects that the union would undertake. At the time of trial, he transferred positions within the union and his title changed to assistant director. **See** N.T., 1/25/2019 a.m., at 8-9.

Notably, PJB did not conduct an interview or a background check prior to issuing the car to Tina. ***See id.***, at 4. Lynne Fox,[6] the PJB manager, indicated that when Tina started volunteering at the union, Tina was still working at the airport, which conducts "background checks" that were more specific than what PJB would have done and therefore, PJB "relied on those checks." N.T., 1/22/2019 p.m., at 51. Fox never asked Tina to "submit any type of authorization in order to obtain all the records" from the former employer that would have given Fox the background information because, as she put it, the employer "might just have verified it." ***Id.***, at 52. Moreover, *per* Fox, PJB did not perform an independent investigation of Tina's background prior to providing the car because Tina worked for the union "for a number of years." ***Id.***, at 53.

PJB's secretary and treasurer, Mildred Saldana, indicated the union did not have a written employee handbook at that time and "did not provide their vehicle usage policy to employees in writing; [rather,] they verbally instructed employees that the only permissible personal use of company cars was for commuting to and from work and job sites." Trial Court Opinion, 6/24/2019, at 5 (quotation marks omitted). "PJB supervised company car usage only through employee-submitted time sheets, mileage logs, and expense reports

---

[6] Fox is a "formally educated and trained attorney," and her responsibilities at the union included strategic planning and overseeing the budget. N.T., 1/22/2019 p.m., at 43.

to cover costs like highway tolls. The auditing was mostly for purposes of compliance with Internal Revenue Service and Department of Labor regulations and for employer reimbursement." *Id.*, at 6.

Fox indicated that "it was the union's philosophy, as well as the philosophy of other unions in the community, that company [car] use was not strictly monitored because if they could not trust a union rep [representative] with a car, they had no business trusting the employee to represent union members." *Id.*, at 5-6. When asked, absent an accident where somebody was seriously injured, how would she know if a non-employee was driving the vehicle, Fox responded, "We wouldn't know." N.T., 1/22/2019 p.m., at 57. Fox further stated, "Well let's just say Philadelphia is a small city. I'm sure sooner or later we would find out, someone would see. But we have no formal method for doing it." *Id.*

Saldana maintained that she provided Tina with "a diagram to help explain the difference between personal and business uses," and told Tina "several times, as part of repeated seminars for the organization, that the employee was the only person permitted to drive the company car." Trial Court Opinion, 6/24/2019, at 5.

Minter averred that Tina "had attended the regular, mandatory staff meetings and retreats where significant time was spent reviewing Department of Labor and Internal Revenue Service guidelines, which allegedly included discussion of PJB's company car policies." *Id.*, at 5. He also confirmed, "the

vehicle use policy was reviewed, at minimum, once per year, occasionally several times per year." *Id.*

Contrary to these statements by PJB's leadership, Tina alleged that PJB did not inform her of these policies, and that she "assumed" she could use the vehicle for both business and personal uses. N.T., 1/23/2019 a.m., at 21-22. Tina added that she "would not have used [the vehicle] for personal reasons if she had been informed it was against company policy." Trial Court Opinion, 6/24/2019, at 6. "There was no written documentation signed by [Tina] to show that she had ever received the policy verbally or in writing, although Lynne Fox testified it was the union's protocol to get signed receipts from the employees at the yearly meetings where they reviewed the vehicle policy with employees." *Id.* Moreover, Fox could not provide any documentation that Tina was at these meetings where the policy was provided. *See* N.T., 1/22/2019 p.m., at 47. Finally, Tina's testimony conforms to her behavior: the PJB company car was the only vehicle in the Johnsons' possession. *See* N.T., 1/23/2019 a.m., at 114-115. They had a Honda Accord, but it was no longer in their possession after they received the PJB vehicle. *See id.*

Furthermore, Tina noted she was not told or given anything from PJB that family members were not permitted to use the vehicles. *See* N.T., 1/23/2019 a.m., at 36-37. Tina stated that "the only vehicle use policy she knew of was an understanding that she would not be reimbursed for personal use mileage, and that no one but her was allowed to drive the car." Trial Court

Opinion, 6/24/2019, at 6.[7] Tina also indicated PJB did not physically monitor her vehicle usage, but rather, PJB supervised the vehicle usage through time sheets and mileage logs. *See* N.T., 1/23/2019 a.m., at 17, 21-22.

Also relevant to our review was the evidence that Tina did not volunteer certain information to PJB. First, she did not inform PJB that her driver's license had been previously suspended due to failure to pay parking tickets and second, that her husband's license had been suspended since 1989. *See id.*, at 15-17. Additionally, while employed at PJB, Tina received a citation for failure to stop at a stop sign. *See id.*, at 42. She did not tell PJB about it, but a copy of the ticket was sent to the union. *See id.*, at 41-42. Tina was unsure if PJB required employees to tell the union about that kind of incident. *Id.*, at 44-45. She stated that after PJB received the ticket, Saldana asked Tina if she paid it, but no further reprimand was issued. *Id.*, at 45-46.

Tina stated that although she did not let Cleveland drive the vehicle for any reason, she did for an emergency. *See id.*, at 38, However, Cheryle Spencer, Spencer's older sister, contradicted this account. Cheryle would see the Johnsons on a daily basis because she and Spencer lived on the same street as Tina's mother and had known the Johnsons for a number of years. *See* N.T., 1/23/2019 p.m., at 78, 82. Cheryle observed Cleveland driving the

---

[7] At trial, Tina testified she was not aware of the non-reimbursement policy, but she was impeached with her January 26, 2018, deposition testimony, wherein she acknowledged that she knew about the policy. *See* N.T., 1/23/2019 a.m., at 34-36.

PJB car "[a]ll the time." *Id.* Cheryle indicated Cleveland would be driving Tina, and in some instances, he would be driving on his own. *See id.* Cheryle averred, in an affidavit, that she had seen Cleveland and/or Cleveland and Tina driving the car "at least a hundred times[.]" *Id.*, at 90.

These policies, actions and inactions taken by PJB and the Johnsons culminated in the events that occurred on October 16, 2014. On that day, Tina drove the PJB vehicle to her mother's house for a small family gathering. She parked the car on the corner of the street, about six houses away from her mother's home. The car was situated so that it jutted out onto the sidewalk, obstructing the walkway by a foot or two.

That same day, Cleveland was hanging out at a friend's house in another part of the city. Between 12:00 p.m. and 2:15 p.m., he consumed approximately four 24-ounce beers. *See* N.T., 1/24/2019 a.m., at 31. Cleveland then left his friend's home and traveled to his mother-in-law's home *via* public transportation. *See id.*, at 32. He proceeded to drink a fifth beer as he walked up to the home. *See id.*, at 36.

Approximately five hours later, Cleveland went onto the porch to smoke a cigarette. *See id.*, at 37. He indicated that he was still intoxicated, due to previously consuming 120 ounces of beer. *See id.*, at 38. It was at this point that Cleveland noticed the PJB car parked down the street, and believed that it was obstructing the sidewalk. *See id.*, at 41-42. However, he did not believe the car's location was an "emergency" situation. *Id.*, at 53.

While walking towards the vehicle, Cleveland observed an open parking spot, and decided to move Tina's car. ***See id.***, at 54. As noted above, since his driver's license had been suspended, Cleveland was not legally permitted to drive a motor vehicle.

Cleveland then went back into the home to grab his wife's car keys. He did not ask Tina or another family member to move the car. ***See id.***, at 54-55. Cleveland believed he could safely operate the vehicle but acknowledged that based on his level of intoxication, he should not have been driving. ***See id.***, at 60.

After driving a short distance, Cleveland stopped at a traffic light at the intersection of Baltimore Avenue and 60th Street. In an attempt to make sure that no pedestrians were crossing the street, he waited "30 to 40 seconds" before turning left. ***Id.*** at 64. Unfortunately, when he made the turn, Cleveland struck Spencer, who was properly in the crosswalk. ***See id.***, at 66-68. Despite believing that he was only traveling at two miles per hour, Cleveland hit Spencer hard enough that Spencer was knocked out of one of his shoes. ***See id.***, at 65; ***see also*** Trial Court Opinion, 6/24/2019, at 3.

Cleveland got out of the car and helped Spencer to a bench while bystanders called 9-1-1. ***See*** N.T., 1/24/2019 a.m., at 67. Police arrived and after Cleveland told them that he hit Spencer, they transported him to the police station where he failed a breathalyzer test. Cleveland was subsequently

criminally charged with driving under the influence ("DUI"), but was not charged with theft or unauthorized use of a vehicle. *See id.*, at 74.

The investigating officer, Officer Laura Maynard, spoke with Tina after the accident. Tina indicated she told officers that Cleveland did not have permission to drive the car that night. *See* N.T., 1/23/2019 a.m., 72. When asked if Tina ever mentioned that Cleveland did not have permission to drive the car, Officer Maynard could not recall. *See* N.T., 1/23/2019 p.m., at 53. Nevertheless, she stated that if Tina had offered that information, it would have been in her crash report and it was not. *See id.*

Later that night, Tina did not contact PJB to inform them about the accident. *See* N.T., 1/23/2019 a.m., at 72. The following day, Tina attempted to cover-up the incident to PJB.[8] She told Saldana that the vehicle had been impounded due to unpaid parking tickets and that she required a letter from PJB granting her permission to recover the vehicle. *See* N.T., 1/22/2019 p.m., 16-20. Without investigating the issue, Saldana wrote the letter for Tina, and informed Fox about the situation, believing that Fox would do a follow up. *See id.*, at 22. Tina also went into the office without telling anyone to obtain a second copy of the car registration that she kept in her office and took it to

---

[8] Tina denied this characterization, admitting only that she "actively delayed" the investigation due to the emotional distress she suffered as a result of the situation. N.T., 1/23/2019 a.m., at 108-109.

the lot to get the car released from the impound. *See* N.T., 1/23/2019 a.m., at 80.

Several days later, the PJB was notified about the crash when police officers showed up at the office. *See* N.T., 1/22/2019 p.m., at 20. Saldana told Fox, who then interviewed Tina for a lengthy period of time. *See id.*, at 21-23, 63. Tina did not tell Fox how badly Spencer had been injured. *See id.*, at 62-63, 66. Fox reviewed the police report, but did not speak with Cleveland based on his unavailability. *See id.*, at 63.

Following the investigation, Fox did not terminate Tina's employment with the union, but merely suspended her for two weeks and revoked her company car privileges, because she "was a really good and valuable employee." *Id.* Fox also stated that PJB did not fire Tina based on Tina's assertion that she did not give Cleveland permission to drive the car. *See id.*, at 70. PJB did not press charges against Cleveland for theft of the vehicle because Tina said he did not have permission and according to Fox, "there was no need to pursue it any further." *Id.*, at 72.

Nevertheless, on October 23, 2014, Fox wrote an e-mail to Tina, copying Saldana and Minter, in which she stated:

> I would hope by now you realized Cleveland was driving the car and the events that unfolded were horrible by themselves, but your covering up what happened after the fact, your failure to report the incident and your active misrepresentations have overshadowed all the good work that you've done over the past couple of years

N.T., 1/22/2019 p.m., at 74-75.

- 13 -

As a result of the accident, Spencer suffered catastrophic injuries, which included a skull fracture, multiple brain injuries, and hemorrhagic contusions. *See* Trial Court Opinion, 6/24/2019, at 9. Because these injuries have significantly affected his brain function, Spencer is permanently wheel chair bound, and unable to care for his basic daily needs. *See id.* He requires around the clock supervision and lives in a medical care facility. *See id.* His brain injuries have significantly affected his cognitive and executive functions. *See* N.T., 1/23/2019, at 22-40. Spencer also now suffers a seizure disorder and is incontinent. *See id.* at 24, 26. He was diagnosed with "personality change due to traumatic brain injury[,]" in which his judgment and insight are impaired. *Id.*, at 19.

On November 23, 2016, Spencer filed a complaint, claiming "PJB Defendants acted and/or failed to act through their agents, servants, employees, predecessors, successors, and/or workmen, and accordingly, any negligent act and/or omission committed by the Defendants' agents, servants, employees, predecessors, successors, and/or workmen imposes liability on Defendants under the laws of agency, *respondeat superior,* and/or vicarious liability." Complaint, 11/23/2016, at ¶ 5. Moreover, he alleged the accident and his resulting injuries were caused "by the, individual and/or collective, negligence, carelessness, and/or recklessness" of Cleveland, Tina, and PJB. 22. Spencer set forth the following causes of action: (1) negligence (including negligence *per se*) against Cleveland; (2) negligence against Tina; (3)

- 14 -

negligence/negligent entrustment against Tina; (4) negligence/negligent entrustment against PJB; and (5) negligent hiring, negligent retention, and negligent supervision against PJB. He demanded judgment, jointly and/or severally, against all three defendants.

The allegations summarized in Spencer's complaint are as follows. First, Cleveland owed a duty to operate the vehicle in safe and non-negligent manner and he breached that duty by driving under the influence and while his license was suspended. *Id.*, at ¶¶ 29-33. Second, Cleveland was operating the car with the express or implied permission of Tina and PJB, and Tina was aware that Cleveland had access to the PJB car and that he used it on the night in question. *Id.*, at ¶¶ 44-48. Third, because PJB owned the vehicle, it owed a duty to Spencer to ensure that its vehicle was operated a non-negligent manner. *Id.*, at ¶ 54. Moreover, PJB knew that Tina used the company car in furtherance of its interest and activities as part of her employment, and knew or should have known of Tina's carelessness and incompetence relating to her use of the company car. *Id.*, at ¶¶ 59-63. Spencer claimed PJB knew or should have known that Tina would give permission to family members, including Cleveland, to operate the vehicle. *Id.*, at ¶ 64-66. Lastly, Spencer asserted PJB failed to enforce its vehicle policy "despite actual or constructive knowledge that its employees, agents, and/or volunteer organizers used PJB vehicles for personal use and/or permitted family members to operate said vehicles." *Id.*, at ¶ 82.

Tina and PJB initially filed a joint answer with new matter and a cross-claim directed to Cleveland pursuant to Pennsylvania Rule of Civil Procedure 1031.1. ***See generally*** Defendants' Philadelphia Joint Board Workers United, SEIU and Tina Gainer Johnson's Answer to Plaintiff's Complaint with New Matter and Crossclaim pursuant to Pa.R.C.P. 1031.1, 4/18/2017. Tina and PJB admitted that it was PJB's vehicle and that Tina had possession of the vehicle due to the course and scope of her employment, but generally denied the allegations set forth in Spencer's complaint, including that Cleveland had authorization or permission to use the car and that they were negligent and breached any duty of care. ***See id.***, at ¶¶ 1-86. In the new matter, Tina and PJB alleged, *inter alia*, that Spencer's claims were barred or limited by the provisions of Pennsylvania Comparative Negligence Act, 42 Pa.C.S.A. § 7102 ("Fair Share Act"),[9] and the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S.A. § 1701, *et. seq.* ***See*** Defendants' Philadelphia Joint Board Workers United, SEIU and Tina Gainer Johnson's Answer to Plaintiff's Complaint with New Matter and Crossclaim pursuant to Pa.R.C.P.

---

[9] As will be discussed in more detail below, the Fair Share Act abolished joint and several liability in most tort cases. ***See*** 42 Pa.C.S.A. § 7102(a.1)(1). However, the statute provides for several exceptions to this general rule, including where the defendant has been held liable for not less than 60% of the total liability apportioned to all parties. ***See*** 42 Pa.C.S.A. § 7102(a.1)(3)(iii).

1031.1, 4/18/2017, at ¶¶ 88-90. Pleadings and discovery were thereafter exchanged.[10]

On March 5, 2018, Tina and PJB filed separate motions for summary judgment. They both allege that while intoxicated, Cleveland operated the vehicle at issue without Tina's or PJB's permission or knowledge, and that Tina was outside the course and scope of her employment at the time of the accident. *See* Defendant Philadelphia Joint Board Workers United, SEIU's Motion for Summary Judgment, 3/5/2018, at ¶¶ 39-42.[11] Moreover, PJB contended there was no evidence to support Spencer's claim of vicarious liability against PJB by pointing to the fact that Cleveland was not an employee of PJB, Tina was not acting within her scope of employment at the time of the accident, and Tina did not give Cleveland permission to drive the car. *See id.*, at ¶¶ 46-57. PJB also claimed Spencer failed to put forth evidence supporting a negligent entrustment cause of action because it was not foreseeable that Cleveland would take the car without Tina's permission. *See id.*, at ¶¶ 58-77. Lastly, PJB asserted that even assuming PJB and Tina owed a duty to Spencer, and Tina was negligent in leaving her keys in an area where they could be accessed by Cleveland, Cleveland's unauthorized and careless use of the car severed the chain of causation. *See id.*, at ¶¶ 79-88.

---

[10] During this time, Tina retained her own private counsel.

[11] *See also* Motion for Summary Judgment of Defendant, Tina Gainer Johnson, 3/5/2018, at ¶ 23-36.

On April 27, 2018, after receiving Spencer's response, the trial court denied both motions. The parties subsequently exchanged numerous motions *in limine* and answers. After the court issued decisions concerning these evidentiary issues, the matter proceeded to trial.

A five-day jury trial began on January 22, 2019.[12] Cleveland and Tina both took the stand in addition to Cheryle Spencer, Officer Maynard, Fox, Saldana, and Minter. The jury also heard the following: (1) the testimony of Susan Teresa Morris, Ph.D., a clinical neuropsychiatrist; (2) the testimony of Jody Masterson, RN, MSN, CRRN, a life care planner;[13] and (3) the videotaped deposition of Guy Fried, M.D., an expert in physical medicine and rehabilitation medicine. The parties stipulated to Spencer's past medical expenses, which were in the amount of $683,311.47. **See** N.T., 1/28/2019, at 107.

At the close of Spencer's case, Tina and PJB both moved for a directed verdict, claiming Spencer failed to make a *prima facie* case against them. **See** N.T., 1/24/2019 p.m., at 57-67. The court denied both motions. **See id.**, at 60, 67.

_____

[12] Shortly before trial, the matter was reassigned to another trial judge. Cleveland represented himself at trial.

[13] On the morning of January 24th, the defendants opted to not call their medical expert, who was scheduled to give life expectancy testimony. Upon learning this, Spencer's counsel sent a subpoena to that expert the morning that he was expected to be called to testify. The trial court quashed the subpoena as improper pursuant to **Spino v. John S. Tilley Ladder Co.**, 696 A.2d 1169 (Pa. 1999).

It merits mention while instructing the jury, the court noted that Cleveland had admitted negligence in the case and that in terms of his liability, the jury was to determine what injury, if any, Spencer sustained that was caused by the accident and the amount of damages, if any, to which Spencer was entitled as compensation for such injury. *See* N.T., 1/28/2019, at 89. In terms of Tina and PJB, the court instructed the jury to determine whether they were negligent and if so, whether their individual negligence was the factual cause in bringing harm to Spencer. *See id.*, at 99.

At the conclusion of the trial, the jury found all three defendants were negligent and their negligence were each factual causes of harm to Spencer. *See* Jury Verdict Form, 1/28/2019, at 1-2.[14] The jury allocated liability as follows: Cleveland (36%), Tina (19%), and PJB (45%). The jury then awarded Spencer $683,311.47 for past medical expenses, $7,300,000 for future medical expenses, and non-economic damages of $5,000,000, for a total verdict amount of $12,983,311.47.

After the court read the verdict, Spencer's counsel stated it was his position that because PJB was Tina's employer and their combined negligence

_____

[14] Those were the only questions posed to the jury on the verdict slip. Additionally, the verdict slip was pre-marked "Yes" for the question, "Was Defendant, Cleveland Johnson, negligent?" due to his criminal conviction and the negligence *per se* claim. *See* Trial Court Opinion, 6/24/2019, at 10 n.7. The questions as to whether his negligence was the factual cause of Spencer's harm and if so, the percentage of liability he bore were left for the jury to decide. *See id.*

was greater than 60%, PJB should be liable for the entire damages award as to all three defendants under a provision of the Fair Share Act. *See* N.T., 1/28/2019, at 127. The court noted the request on the record, but did not agree to it. *See id.*, at 128. Tina and PJB both orally requested relief in the form of judgment notwithstanding the verdict ("JNOV"), which the trial court denied. *See id.*, at 128-129.

Spencer filed a post-trial motion for delay damages pursuant to Pa.R.C.P. 238, which he alleged amounted to $1,005,228.44. Spencer alleged that the entire verdict was collectible against the PJB "based upon the jury's finding that the [PJB] and its employee, Tina Gainer Johnson were more than 60% responsible." Plaintiff's Petition for Delay Damages Pursuant to Pa.R.C.P. 238, 2/4/2019, at 2 n.1.

Spencer also filed a post-trial motion to mold the verdict. He submitted two bases to hold PJB jointly and severally liable for his harms and losses – one, PJB was directly and vicariously liable for the jury's allocation of fault on Tina as her employer, and two, Section 1574 of the Motor Vehicle Code subjected PJB to liability. *See* Plaintiff's Post-Trial Motion to Mold the Verdict, 2/7/2019, at ¶¶ 74-91. Moreover, he asserted that since the combined negligence of PJB and Tina exceeded 60%, PJB was responsible for the entire amount pursuant to the Fair Share Act. *See id.*, at ¶ 92.

Tina and PJB also filed post-trial motions, seeking relief in the form of JNOV, a new trial, and remittitur, or reduction of the amount of, the jury's

verdict. **See** Motion for Post-Trial Relief of Defendant, Philadelphia Joint Board Workers United, SEIU, 2/4/2019; **see also** Motion for Post-Trial Relief of Defendant, Tina Gainer Johnson, 2/15/2019. Both Tina and PJB alleged that the verdict was against the weight of the evidence because Cleveland was unlicensed, intoxicated, and he admitted his actions were the sole contributing cause of the accident at issue. They contended it shocked one's sense of justice that Cleveland as found to be only 36% liable. They also asserted remittitur is proper because Spencer did not proffer an expert to testify regarding his life expectancy at trial, and therefore, the verdict was excessive as it did not represent reasonable compensation for Spencer's injuries.

Tina separately argued there was insufficient evidence to support the jury's finding of negligence against her because she alleged that Pennsylvania law did not permit a finding of negligence based on an allegation that she left car keys where they could be accessed by a spouse or any other competent adult. **See** Motion for Post-Trial Relief of Defendant, Tina Gainer Johnson, 2/15/2019, at ¶ 3. She stated the trial testimony unequivocally established that Cleveland took the keys without her permission or knowledge and therefore, she had not breached a duty to Spencer and her conduct was neither the factual nor the legal cause of his harm. **See id.**

On April 23, 2019, the trial court denied Tina's and PJB's post-trial motions. That same day, the court entered the following order, disposing of Spencer's motion to mold the verdict and his motion for delay damages:

AND Now, this 23rd day of April, 2019, upon consideration of [Spencer]'s Post-Trial Motion to Mold the Verdict …, it is hereby ORDERED and DECREED that said Motion is DENIED. As a matter of law, Defendant Philadelphia Joint Board is liable for compensatory damages only in the amount of $5,842,490.16.[1]

Furthermore, upon consideration of [Spencer]'s Motion for Delay Damages …, it is hereby ORDERED AND DECREED that said Motion is DENIED IN PART, GRANTED IN PART as follows: Pursuant to Rule of Civil Procedure 238, [Spencer] is entitled to delay damages only as calculated from August 17, 2017 to January 28, 2019, and only as calculated on the compensatory damages for which it is actually liable (see above).Thus the total amount of delay damages is $453, 872.69.[2] Adding this amount to the compensatory damages amount above, the full amount of damages attributed to Philadelphia Joint Board is $6,296,362.85. The verdict shall be so molded.

_____

[1] 45% of the total compensatory damages award of $12,983,311.47 under the jury's apportionment of liability.

[2] 136 days of 2017 (from 8/17/17 to 12/31/17) divided by 365 (.0.3726), multiplied by $5,842,490.16 (yielding $2,176,911.83), multiplied by the interest rate ("IR") of 4.75% = $103,403.31 for 2017 interest; 365 days of 2018, calculated as above on 5.5% IR = $321,336.96 for 2018 interest; and 28 days of 2019 (from 1/1/19 to 1/28/19), calculated as above on 6.5% IR = $29,132.42 for 2019 interest.

Order, 4/23/2019, at 1-2.

On May 17, 2019, the court entered judgment in favor of Spencer and against PJB in the amount of $6,296,362.85, against Tina in the amount of

$2,466,829.18, and against Cleveland in the amount of $4,673,992.13.

Spencer, Tina, and PJB all filed notices of appeal.[15, 16]

Spencer raises the following issues on appeal:

1. Did the trial court err as a matter of law when it refused to mold the entire verdict against the [PJB] because its direct and vicarious liability (64%) exceeded the 60% threshold under the Fair Share Act?

2. Did the trial court err as a matter of law when it failed to mold the entire verdict against the PJB where the PJB is estopped from retracting its judicial admission that [Tina] acted within the course and scope of her employment "24/7" while possessing and controlling the PJB's vehicle?

3. Did the trial court err as a matter of law when it failed to mold the entire verdict against the PJB when the PJB is legally responsible for the negligent acts or omissions of [Tina], regardless of whether the negligent conduct occurred within the scope of her employment or outside the course and scope of her employment?

4. Did the trial court commit an abuse of discretion in failing to mold the verdict to impose the full measure of delay damages against the [PJB]?

Brief of Appellant, at 3-4.

---

[15] After Spencer filed his notice of appeal, he filed an amended post-trial motion for delay damages on May 30, 2019. He alleged the delay damages were awarded only against the PJB, and not Tina and Cleveland, and therefore, he sought an amended order reflecting relief against all three defendants. The trial court did not rule on the amended motion because it no longer had jurisdiction pursuant to Pa.R.A.P. 1701.

[16] The court did not order the parties to file concise statements pursuant to Pa.R.A.P. 1925(b). Nevertheless, the court issued a Pa.R.A.P. 1925(a) opinion on June 24, 2019. We also note that the Pennsylvania Association for Justice filed an *amicus curiae* brief on behalf of Spencer in this matter.

PJB presents the following issues on appeal:

    A. Did the trial court correctly deny [Spencer]'s request to mold the entire verdict against the [PJB] because there was no evidence to support a determination that [Tina] was acting in the course and scope of her employment at the time of the accident and the jury was never asked to make such a determination?

    B. Did the trial court correctly deny [Spencer]'s request to mold the entire verdict against the [PJB] where the jury separately assessed the direct and vicarious liability of [Tina] and the [PJB] and where there is no basis to mold the verdict under the Fair Share Act?

    C. Did the trial court correctly deny [Spencer]'s request to mold the entire verdict against the [PJB] based upon the Restatement (Second) of Torts, Section 317, or Section 1547(B) of the Motor Vehicle Code, because the jury separately assessed the liability of the parties and, therefore, there is no basis to mold the verdict under the Fair Share Act?

    D. Did the trial court correctly deny [Spencer]'s request to impose the full measure of delay damages as to the [PJB], where the rules of civil procedure and all relevant case law provide that delay damages are only to be awarded on the portion of the verdict attributable to each defendant?

    E. Did the trial court abuse its discretion in denying the request for a new trial where the jury attributed a greater percentage of liability to the owner of the vehicle involved in the accident than to the other defendants, including the intoxicated driver, who admitted negligence?

    F. Did the trial court err in denying the request for a remittitur?

Brief of Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU, at 2-3.

Lastly, Tina raises the following claims:

    1. Did the trial court err by denying Tina Johnson judgment JNOV or a new trial on all issues, as the verdict was not supported by

sufficient evidence to establish a prima facie case of negligence or causation against Tina Johnson, and, at a minimum, the verdict was against the weight of the evidence?

2. Did the trial court err by denying Tina Johnson a new trial on all issues because the verdict apportioning only 36% liability to Cleveland Johnson was against the weight of the evidence?

3. Did the trial court err by denying a new trial on damages, or alternatively, a substantial remittitur as the verdict of over $13 million was against the weight of the evidence and manifestly excessive, the verdict was not supported by the evidence, there was no expert medical testimony on life expectancy and other matters, and the "punitive" verdict violated basic fairness and due process, could only be the product of highly prejudicial errors, and shocks the conscience?

Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 5.

Based on the nature of the issues in Spencer's appeal and PBJ's and Tina's cross-appeals, we have divided the arguments by subject matter.

**I. Vicarious Liability and the Fair Share Act Arguments**

The polestar of Spencer's appeal is that Tina's negligence should be imputed to PJB, as her employer, because she was purportedly acting in the course and scope of her employment at time of the accident. Therefore, Spencer contends PJB should be held vicariously liable for Tina's actions.

Based on this assertion, Spencer argues the court should have molded the verdict under a provision of the Fair Share Act that permits a plaintiff to recover solely from a single defendant, where the defendant has been found to be at least 60% responsible for the plaintiff's injuries. *See* 42 Pa.C.S.A. § 7102(a.1)(3)(iii) ("A defendant's liability in any of the following actions shall be joint and several, and the court shall enter a joint and several judgment in

favor of the plaintiff and against the defendant for the total dollar amount awarded as damages … [w]here the defendant has been held liable for not less than 60% of the total liability apportioned to all parties.").

In support of this central argument, Spencer first contends the court erred in failing to mold the verdict against PJB because PJB and Tina judicially admitted that Tina possessed the PJB car within the course and scope of her employment, and therefore, PJB is vicariously liable for Tina's negligence. ***See*** Brief of Appellant, at 24-25. Additionally, he argues the trial court erred as a matter of law interpreting what constituted the "course and scope of employment" issue because it "focused on the fact that [Tina] had driven to her mother's home for a family gathering and that the visit was not for union business as the only basis the jury could consider that she was not acting within the course and scope of employment." ***Id.***, at 26.

Spencer also asserts the trial court erred in instructing the jury to consider whether Tina acted within the course and scope of her employment. ***See id.*** Spencer contends that there was no issue regarding Tina's conduct as within the course and scope of her employment: Tina's "24 [hours]/7 [days a week] possession and control" of the car fell within the course and scope of employment "because (1) it was the kind of activity [Tina] had been retained to perform; (2) occurred within the time and space limits of her employment; and (3) was actuated, at least in part, to serve the PJB." ***Id.***, at 27.

Spencer continues, in his second argument, that the court erred in failing to mold the verdict against PJB where the jury determined Tina was an agent of PJB and PJB negligently supervised Tina within the course and scope of her employment. **See** Brief of Appellant, at 28. Spencer noted the court charged the jury with Pennsylvania Standard Civil Jury Instruction 6.70 (Principal's Negligent Hiring or Retaining of Employee or Independent Contractor),[17] which is based on Restatement (Second) of Agency § 213.[18]

---

[17] In his brief, Spencer incorrectly cites to Pa. SSJI (Civ), §6.120, which is the former number for this jury instruction. Spencer did reference the correct jury instruction number in his post-trial motion to mold the verdict. **See** Plaintiff's Post-Trial Motion to Mold the Verdict, 2/7/2019, at ¶ 85.

[18] Section 213 provides:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> (a) in giving improper or ambiguous orders of in failing to make proper regulations; or
>
> (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others:
>
> (c) in the supervision of the activity; or
>
> (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency, § 213 (1958).

The Pa. SSJI (Civ), §6.70 instruction

*See* Brief of Appellant, at 28. He states that because the court charged the jury on the question of PJB's potential negligence within the course and scope of Tina's employment, and the jury found PJB was liable on the issue, it was obvious that Tina's liability flowed from her negligent control and possession of the vehicle within the course and scope of her employment as an agent of PJB. *See id.*, at 29.

In Spencer's third issue, he offers a related argument contending that even if PJB and Tina did not concede that Tina's conduct fell within the course

---

is based on Restatement (Second) of Agency section 213, which has been recognized, although not formally adopted, by the Pennsylvania appellate courts. *Heller v. Patwil Homes, Inc.*, 713 A.2d 105 (Pa.Super. 1998). The Pennsylvania Superior Court in *Heller* recognized that "an action for negligent hiring provides a remedy to injured third parties who would otherwise be foreclosed from recovery under the master-servant doctrine because the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the master's business." *Id.* at 107. The Superior Court in *Heller* cited the earlier Pennsylvania Supreme Court decision in *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418 (Pa. 1968), which had also cited section 213. However, the *Dempsey* court had not formally adopted section 213, and its analysis of the employer's liability was conducted solely under the Restatement (Second) of Torts section 317. Notably, in *Heller*, the Superior Court indicated that in order to assess liability under section 213, a "similar inquiry" to the one conducted by the Supreme Court in *Dempsey* under section 317 must be made in order to assess whether the defendant employer knew, or should have known, of the employee's propensities.

Pa. SSJI (Civ), §6.70, *Subcommittee Note*.

and scope of her employment, PJB is still vicariously liable for the full verdict because the incident involved the use of PJB's chattel, the company car, and its negligent supervision of Tina. **See** Brief of Appellant, at 30-35. He states that Restatement (Second) of Torts § 317[19] "provides the basis for holding an employer directly liable for conduct outside the course and scope of employment involving the use of the employer's chattel." **Id.**, at 30. Moreover, Spencer contends that both Restatement (Second) of Torts § 317 and Restatement (Second) of Agency § 213 impose a duty on an employer to

---

[19] Section 317 provides:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
>> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>>
>> (ii) is using a chattel of the master, and
>
> (b) the master
>
>> (i) knows or has reason to know that he has the ability to control his servant, and
>>
>> (ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts, § 317 (1965).

exercise reasonable care in selecting and supervising employees. ***See id.***, at 31. Spencer states that to prevail on a claim for negligent supervision, "there must be some evidence that had the employer been more diligent in performing a background investigation of the employee or better supervising the employee, the tortious conduct could have been prevented." ***Id.*** (citation omitted).

Based on this notion, he points to the following evidence: (1) there was no dispute Tina used the chattel of her employer; (2) at trial, PJB conceded it did not supervise Tina's use of the car; and (3) the jury concluded that Tina's actions created a risk of harm to others. ***See id.*** Spencer contends PJB was still vicariously liable based on its failure to supervise Tina's use of the car in a proper manner. ***See id.*** Furthermore, he states the inquiry to determine liability under Restatement (Second) of Torts § 317 and Restatement (Second) of Agency § 213 is similar and therefore, the result is the same whether or not Tina was acting within or outside the scope of employment as PJB is legally responsible for her conduct under either scenario. ***See id.***, at 32-33.

Next, Spencer maintains joint and several liability under the Fair Share Act applies to the present matter based on the theory that Tina was acting within the course and scope of her employment and PJB was vicariously liable for her actions. In this argument, he contends the Fair Share Act does not immunize employers for the negligence of its employees. ***See*** Brief of Appellant, at 35. Specifically, he asserts Tina's liability is attributable to PJB,

and therefore, pursuant to Subsection 7102(a.1)(3)(iii) language of the Fair Share Act, PJB should be fully liable for the entire judgment. *See id.*, at 37. Relying on *Livingston v. Greyhound Lines, Inc.*, 208 A.3d 1122 (Pa. Super. 2019), Spencer also states the Fair Share Act "did not expressly overturn established precedent regarding an employer's vicarious liability for acts within the course and scope of employment[,]" and "it did not extinguish an employer's liability for acts inside or outside the scope of employment with the employer's chattel which are reasonably foreseeable and are the result of negligent supervision." Brief of Appellant, at 36.

Moreover, Spencer contends the Fair Share Act "does not preclude a trial court from molding the verdict when an employer's negligence is less than 60%." *Id.* Pointing again to *Livingston*, he states a panel of this Court held as a matter of law that the employer in that case "was liable for the full measure of the plaintiff's damages based on vicarious liability." Brief of Appellant, at 36.

In response to Spencer's arguments, PJB counters that the trial court correctly denied Spencer's request to mold the entire verdict against it because there was no evidence to support a determination that Tina was acting in the course and scope of her employment. *See* Brief of Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU, at 12. PJB states Spencer waived this argument because he never asked that the jury make any specific findings of fact as to whether Tina was acting with the

course and scope of her employment. *See id.* PJB further asserts that even if the trial court were to decide the course and scope of employment issue rather than the jury, Spencer could not prove that Tina was acting within the course and scope of her employment at the time of the accident. *See id.*, at 13. In this regard, PJB states that Spencer cannot demonstrate it made any judicial admissions that Tina acted within the course and scope of her employment at all pertinent times, and Spencer's counsel never asked the court to instruct the jury that such an admission had been made. *See id.*[20]

Moreover, PJB notes that as for the jury instructions given by the court, Spencer did not object to any of these instructions or the questions on the verdict sheet. *See* Brief of Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU, at 16-17. PJB also states the court correctly determined that the Fair Share Act applies and mandates that it is only responsible for that portion of the damages attributable to its percentage of liability as determined by the jury. *See id.*, at 19.

Our review of a trial court's denial of a motion for post-trial relief is limited:

---

[20] PJB further alleges that the "on call" description regarding the nature of Tina's job was not a judicial admission, and "this evidence does not support a determination that every action that [Tina] performed 24 hours per day, 7 days per week was considered to be within the course and scope of her employment." Brief of Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU, at 14. Rather, PJB states Tina was "on call" but engaged in non-work related activities at the time of the accident that did not serve the interests of PJB. *Id.*

Our review is limited to determining whether the trial court abused its discretion or committed an error of law. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. If the alleged mistake concerned an error of law, we will scrutinize for legal error. On questions of law, our standard of review is *de novo* and our scope of review is plenary.

**Zaleppa v. Seiwell**, 9 A.3d 632, 635 (Pa. Super. 2010) (citations and quotation marks omitted).

To resolve the question of how the Fair Share Act applies here, we must examine the precise nature of the claims and defenses presented in the trial court. To prove his negligence claim, Spencer was permitted to proceed on theories of direct and vicarious liability. The concepts of vicarious and direct liability are central to the arguments presented by the parties:

A plaintiff may pursue a negligence action against a defendant on the theory of direct liability or vicarious liability. Under a direct liability theory, a plaintiff seeks to hold the defendant responsible for harm the defendant caused by the breach of a duty owing directly to the plaintiff. Vicarious liability, on the other hand,

is a policy-based allocation of risk. Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it. Once the requisite relationship (*i.e.*, employment, agency) is demonstrated, the innocent victim has recourse against the principal, even if the ultimately responsible agent is unavailable or lacks the ability to pay.

**Green v. Pa. Hosp.**, 123 A.3d 310, 316 (Pa. 2015) (citations and quotation marks omitted). "Where a corporation is concerned, the ready distinction

between direct and vicarious liability is somewhat obscured because we accept the general premise that the corporation acts through its officers, employees, and other agents. The corporation, as principal, assumes the risk of individual agents' negligence under the theory of vicarious liability." ***Scampone v. Highland Park Care Ctr., LLC***, 57 A.3d 582, 597 (Pa. 2012) (citations omitted).

> Under Pennsylvania law, in order to hold an employer vicariously liable for the negligent acts of its employee, these acts must be committed during the course of and within the scope of the employment.
>
> [Generally,] [t]he conduct of an employee is considered within the scope of employment for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer.

***Ludwig v. McDonald***, 204 A.3d 935, 943 (Pa. Super. 2019) (citations and quotation marks omitted). ***See also*** Restatement 2d of Agency, § 228.

"Generally, the scope of [an employee's] employment is a fact question for the jury. Where the facts are not in dispute, however, the question of whether … the [employee] is within the scope of this [] employment is for the court." ***Ferrell v. Martin***, 419 A.2d 152, 155 (Pa. Super. 1980). ***See also Ludwig***, 204 A.3d at 943.

Additionally, the theory of negligent entrustment is relevant to our review:

It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

... However, our cases do require that the entrustee be causally negligent before the entrustor may be held liable through negligent entrustment.

**Phillips v. Lock**, 86 A.3d 906, 913 (Pa. Super. 2014) (citation omitted). **See also** Restatement (Second) of Torts § 308.

Here, the trial court found that Spencer's Fair Share Act argument depended on the premise that PJB was vicariously liable. **See** Trial Court Opinion, 6/24/2019, at 20. The court rejected this premise because the jury never made a specific finding to that effect, and the court did not conclude that the evidence supported such a finding. **See id.** The trial court further explained its rationale as follows:

Firstly, we note that, despite [Spencer]'s contention that the jury was free to conclude that [Tina] was acting as an employee/agent, and also that she had consented to [Cleveland] driving, the jury simply did not make any specific findings as to either of those issues. The verdict slip, which was drafted with the input of all counsel, had only two questions regarding [Tina]: "Was Defendant Tina Gainer Johnson negligent?" and "Was Defendant Tina Gainer Johnson's negligence a factual cause of harm to Plaintiff Keith Spencer?" (See verdict slip Questions 3 and 4). There were no specific queries addressing whether [Tina] was acting as a PJB's agent at the time of the incident, or whether she had authorized [Cleveland] to use the vehicle. [Spencer]'s counsel approved the verdict form as it was given to the jury. The Complaint describes direct negligence/negligent entrustment claims against [Tina] and against PJB, though only PJB was averred to have acted in the course of its employment relationship ("More specifically, the acts and/or omissions of PJB, by and through, Defendant Tina Gainer Johnson or Cleveland Johnson

- 35 -

which constituted negligence, carelessness, and recklessness ….." [Compl. ¶ 56]). As [Spencer] himself admitted in his Motion to Mold the Verdict, "whether a person acted in the course and scope of their employment is ordinarily a question for the jury." As [Spencer] did not put those specific questions to the jury, the jury did not answer them, and it is not clear from the verdict slip whether they found [Tina] directly liable, directly and vicariously liable, or only vicariously liable. The full sum and substance of the jury's verdict is the verdict as read and affirmed in Court. The jury's verdict simply did not include the factual findings [Spencer] needs to say that, after a trial in which [Tina] and PJB were tried as wholly distinct parties with separate defenses and different legal counsel, the jury intended to hold PJB fully liable for [Tina]'s negligence.

Furthermore, even if it were appropriate for this Court to decide these questions of fact in the place of the jury, we find it highly unlikely [Spencer] could prevail in arguing that [Tina] was acting within the course and scope of her employment during the incident. It is undisputed that [Tina] was making a family visit at the time of the incident, and she admitted that her driving the car to her mother's house was personal, rather than business-related. Furthermore, the visit was for recreational purposes, and [Tina] was not normally required by her job to perform such visits. Furthermore, there was no evidence that her visit was actuated, to any degree, by her performance of her work as a union organizer. Therefore, we do not see that there would have been sufficient basis for the jury to find, if it had been specifically queried, that [Tina] was acting in the course and scope of her employment such that PJB must bear vicarious liability for her negligence in permitting [Cleveland] to use the car.

Trial Court Opinion, 6/24/2019, at 20-22 (some citations and quotation marks omitted).

We are constrained to disagree with the trial court's rationale based on the following. First, we conclude there was sufficient evidence to support a finding that Tina's acts were committed during the course of and within the scope of her employment. It is uncontested that Tina and Cleveland were

attending a family gathering at the time of incident. She testified that the purpose of driving the company car to her mother's house was personal, rather than related to the business of PJB. **See** N.T., 1/23/2019 a.m., at 47. Furthermore, Tina's actions were not of the kind and nature that she was employed to perform, she was not acting substantially within the authorized time and space limits of her employer, and her acts were not actuated, in part, by a purpose to serve PJB. **See Ludwig**, 204 A.3d at 943.

None of these undisputed facts alter another undisputed fact: that Tina was on-call "24/7" for her job with PJB. Here, as summarized by the trial court, PJB considered these vehicles "absolutely essential to the work of organizers and business representatives" since "employees could be required to drive out to job sites at any hour of day or night, twenty-four hours a day." Trial Court Opinion, 6/24/2019, at 5. **See also** N.T., 1/23/2019 a.m., at 17 (Tina testifying that they were "24-hour workers"). Further, it is undisputed that Tina was continuously on-call and that this was the reason PJB supplied her with a company vehicle. Undoubtedly, the vehicle was provided so that while Tina was at home, engaged in personal, not union, business, she could respond immediately by driving directly to a worksite to respond to union needs. However, nothing in the record indicates that Tina was excused from being on-call if she left her home for non-union reasons.

At any time when Tina was not explicitly off-duty (for example, on vacation), she was expected to drive directly from where she was to a

worksite. It was expected that she have the company car nearby when she was on-call, and would therefore use the company car while she was on-duty. This is further supported by the undisputed fact that Tina and Cleveland had only the company car for their personal use, having sold their other car when Tina received the company car. As we stated above, the trial court found that PJB supplied the cars because "employees could be required to drive out to job sites at any hour of day or night, twenty-four hours a day." Trial Court Opinion, 6/24/2019, at 5.

Moreover, it is telling that PJB did not have a written employee handbook at that time and did not provide their vehicle usage policy to employees in writing. *See id.*, at 5. Rather, they alleged that at seminars and meetings, they provided verbal instructions to employees that the only permissible personal use of company cars was for commuting to and from work and job sites. *See id.* Nevertheless, there was no written documentation signed by Tina to show that she had ever received the policy, and PJB could not provide any documentation that Tina attended those meetings where the policy was provided. *See id.*, at 5-6; *see also* N.T., 1/22/2019 p.m., at 47. Furthermore, Tina testified that PJB never informed her of the vehicle usage policies. *See* N.T., 1/23/2019 a.m., at 21-22.

Under these circumstances, we agree with Spencer that the jury could have reasonably concluded that Tina was acting in the course and scope of her employment when she drove the company car to her mother's house on

the day of the accident. Underscoring the undefined nature of Tina's work obligations, the accident occurred on a Thursday. There was no evidence presented at trial which conclusively disputed that Tina worked the day of the accident. When asked at trial whether she worked on that Thursday, Tina responded that she could not definitively say. *See* N.T., 1/23/2019 a.m., at 19-20. Additionally, the evidence at trial did not decisively establish Tina was aware of the union's motor vehicle policy. Accordingly, the jury could have found that PJB was vicariously liable for the negligent acts of Tina.

Likewise, the jury could have also concluded that PJB negligently entrusted the vehicle to Tina where it failed to conduct to a background check on Tina and failed to monitor her vehicle usage. *See* N.T, 1/22/2019 p.m., at 51-53, N.T., 1/23/2019 p.m., at 17, 21-22. Moreover, the jury could have inferred that because of these failures, PJB should have known that Tina intended to use the car in such a manner as to create an unreasonable risk of harm to others, *i.e.*, allowing her non-licensed husband to drive the company car, the only car that was in the couple's possession. *See Phillips*, 86 A.3d at 913.

This leads us to the verdict slip. Contrary to the trial court's determination, while the verdict slip did not set forth specific findings as to vicarious liability, we cannot conclude the lack of special interrogatories should read to narrow the verdict in favor of Spencer. Instead, our research leads us

to conclude that any ambiguity in the verdict is to be construed in Spencer's favor as the verdict winner.

We begin with the Pennsylvania Supreme Court's decision in *Halper v. Jewish Family & Children's Services*, 963 A.2d 1282 (Pa. 2009). In *Halper*, the plaintiffs filed a civil action against the defendant, alleging two theories of negligence. The jury returned a general verdict finding the defendant was negligent, but the jury was not asked to differentiate between the two theories of negligence. The verdict was problematic because the plaintiff was only able to recover under one of those theories.

In addressing the matter, the *Halper* Court adopted the "general verdict rule," which provides that "when the jury returns a general verdict involving two or more issues and its verdict is supported as to at least one issue, the verdict will not be reversed on appeal." *Id.*, at 1289. It further stated that it adopted and applied the rule because it would not shift the burden to the plaintiffs due to the defendant's failure to request a special verdict slip, and the evidence was clearly sufficient to support at least one of the plaintiffs' two theories of liability. *See id.*

More recently, in *Shiflett v. Lehigh Valley Health Network, Inc.*, 217 A.3d 225 (Pa. 2019) ("*Shiflett II*"), the plaintiff couple sued the hospital for negligence in connection with injuries the wife sustained while in the hospital for knee surgery. The plaintiffs presented three claims of negligence: (1) vicarious liability related to a post-surgical unit ("PSU") nurse-employee;

(2) vicarious liability related to a transitional skills unit ("TSU") nurse-employee, and one for corporate liability associated to events that occurred in the PSU. The verdict sheet included general questions of negligence regarding the nurses and the hospital. ***See id.***, at 229-231. The verdict sheet then provided that if the jury find either nurse or the hospital was negligent, then it should determine the amount of damages. ***See id.***, at 231. Neither party's counsel raised objections.

The jury found that the TSU nurse and the hospital were negligent and awarded damages of over two million dollars. The hospital filed a post-trial motion, in which it did not challenge the unallocated nature of the damages, but reiterated a claim it had previously raised that the vicarious liability cause of action, relating to the TSU nurse, was improper because it allowed the time-barred claim to be submitted to the jury.[21] ***See id.***

A panel of this Court agreed and determined that the vicarious liability (as to the TSU nurse) claim was time-barred and should not have been submitted to the jury. ***Shiflett v. Lehigh Valley Health Network, Inc.***, 174 A.3d 1066, 1086 (Pa. Super. 2017) ("***Shiflett I***"). The panel then addressed the question of whether the case would have to be remanded. The panel determined that because the verdict sheet did not itemize the award of

---

[21] The plaintiffs raised the claim regarding the TCU nurse for the first time in their second amended complaint, which was filed more than two years after the incident occurred, thereby invoking the statute of limitations.

damages by claim, it was impossible to ascertain whether a portion of the award was attributable to the finding of negligence on the time-barred claim. *See id.*, at 1092. The panel then concluded that "[i]t is impossible to determine from the verdict sheet (which did not break down damages by claim) whether all of the damages awarded by the jury were caused by [the wife's] fall in the PSU, or whether some portion of those damages was the result of the negligence found to have taken place in the TSU." *Id.*

Finding "the general verdict rule" in *Halper* governed, the Supreme Court reversed the panel's decision and held that "[w]here a plaintiff has at least one viable theory of recovery supported by competent evidence, a new trial will not be awarded where the issue complained of on appeal would have been avoided but for the defendant's failure to request a special interrogatory on the verdict sheet that would have resolved the issue." *Shiflett II*, 217 A.3d at 234.

> The *Shiflett II* Court further stated:
>
> As the Superior Court itself recognized in its parenthetical remark, a special interrogatory on the verdict sheet allocating damages by claim would have eliminated this quandary, as it would have clarified whether the jury's award of damages was for the [h]ospital's corporate negligence in the PSU, the [h]ospital's vicarious liability for [nurse-employee]'s negligence in the TSU, or some combination of both. The [h]ospital's failure to request a special interrogatory allocating damages by claim, despite multiple opportunities to do so, results in a waiver of any right to a new trial.

*Id.*, at 235 (footnote omitted).

The Supreme Court noted that the Superior Court panel's decision to grant a retrial on damages was based on an assumption that the plaintiffs suffered separate and distinct injuries from the hospital's corporate negligence in the PSU and its vicarious liability in the TSU. *See id.* However, the Supreme Court determined that the evidence at trial was "entirely consistent" with a finding that the plaintiffs suffered a single injury caused by the hospital's corporate negligence in the PSU. *Id.* Moreover, the Court stated that the hospital "never introduced any evidence at trial to support a determination that the [plaintiffs] suffered separate and distinct injuries from its alleged negligence in the PSU and in the TSU." *Id.* The Court concluded:

> As such, it was within the jury's province, based upon the above-referenced evidence, to find that while [the nurse-employee] was negligent in the TSU, this negligence did not result in any additional damages not already caused by the [h]ospital's corporate negligence in the PSU. Because the [plaintiffs] have a remaining viable theory of liability (corporate negligence) and a damage award that may be fully attributable to that theory of liability, the jury's verdict must stand.

*Id.*, at 235–236. Lastly, the Court reiterated that like in *Halper*, it "will not shift to a plaintiff the burden of a new trial based upon a defendant's failure to request a clarifying special interrogatory." *Id.*, at 236 (footnote and citation omitted).

While the issue here does not include a request for a new trial, we find the same principles in *Halper* and *Shiflett II* can be applied. As noted above, Spencer pursued multiple theories of negligence against PJB and Tina, including, but not limited to, negligent entrustment and vicarious liability.

At trial, the court charged the jury, in relevant part, as follows:

> I will now explain what negligence is. A person, meaning [Tina] and also [PJB] when I say person, must act in a reasonably, careful manner to avoid injuring or harming others. The care required varies according to the circumstances and the degree of danger at a particular time. You must decide how a reasonably, careful person would act under the circumstances established by the evidence in this case.

> A person or entity who does something that a reasonably, careful person would not do under the circumstances is negligent. A person also can be negligent by failing to act. A person who fails to do something that a reasonably, careful person would do under the circumstances is negligent.

> In order for [Spencer] to recover in this case, a defendant's negligent conduct must have been a factual cause in bringing about harm. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct.

> To be a factual cause the conduct must have been the actual real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or a fanciful fact having no connection or only an insignificant connection with the harm. To be a factual cause a defendant's conduct need not be the only factual cause. The fact that some other causes concur with the negligence of a defendant in producing an injury does not relieve a defendant from liability as long as its own negligence is a factual cause of the injury.

> Sometimes a person's negligent conduct combined with other circumstances or other people's conduct can cause an injury. When a defendant's negligent conduct combined with other circumstances or the conduct of other persons, the defendant is legally responsib[le] if his or her conduct was one of the factual causes of the harm. In such a case a defendant is fully responsible for the harm suffered by the plaintiff regardless of the extent to which a defendant's conduct contributed to the harm.

> Pennsylvania law presumes that the driver of a vehicle has the vehicle owner's permission to drive the vehicle. In this case [Tina and PJB] offered evidence that they did not give [Cleveland] permission to drive the vehicle. If you find this testimony

believable, then you may find that one or both did not give [Cleveland] permission to drive the vehicle.

A person should not authorize or permit his or her vehicle to be driven by someone he or she knows or should have known would create a [un]reasonable risk of harm to others while operating the vehicle or was not licensed to drive the vehicle.

The defendant [PJB] is a corporation and can only act through its officers, agents, and employees. Any act or admission of an officer, agent, or employee of the corporation performed within the scope of his or her employment is chargeable to the corporation.

The issue here for you to decide is whether [Tina] as a union representative of the defendant corporation was acting as an employee of the corporation and within the scope of her agency or authority. If you find her acts and the situation here involved were such as are customarily performed by one holding a possession of a similar nature and that they … pertain to the ordinary business of the corporation, you may conclude that she was authorized to perform such acts and that the corporation is liable for the consequences of such acts.

If you find that she acted without the authority or beyond the scope of her authority but find that her acts were later ratified by the corporation either expressly or either by accepting and retaining the benefits of such acts, you may find the corporation responsible for the consequences of such acts.

A person, that is the [PJB], conducting activ[ity] through servants or other agents is liable for harm to others if the person is either negligent or reckless. First, an employee, an improper person in work involving risk of harm to others. And second, supervising the activity. Or third, in permitting or failing to prevent negligence or other wrongful conduct by a person whether or not his or her servants or agents or people is under her or her control.

In determining whether the [PJB] was negligent or reckless in hiring, supervising, or retaining [Tina], you should consider whether the [PJB] knew or should have known that [Tina] possessed certain characteristics or propensities in behavior or conduct that rendered her unfit or incompetent to work in a position with the [PJB].

…

As I've told you, in order to recover in this case against one or more of the defendants, you must find that the conduct of the defendant whom you have found negligent was a factual cause in bringing about the plaintiff's damages. If you find that a defendant cause distinct damage from those of another defendant, you must decide what percentage of the plaintiff's damages was caused by that defendant's negligence.

N.T., 1/28/2019, at 100-104, 109. No one objected to these jury instructions.

Notably, the instructions informed the jury that the jury was to decide the issue of whether Tina was acting as an employee of PJB and within the scope of her agency or authority. Furthermore, the instructions imparted that PJB could be found responsible even if Tina's acts were not within the course and scope of employment if the jury found that PJB subsequently ratified her actions. Likewise, the court's instructions touched upon both cumulative and independent theories of negligence regarding PJB and Tina. Accordingly, the jury could infer PJB's and Tina's negligence based on individual or vicarious liability theories.

The verdict slip form revealed a generalized jury determination. The verdict slip had only two special interrogatories regarding Tina: "Was Defendant, Tina Gainer Johnson negligent?" and if so, "Was Defendant, Tina Gainer Johnson's negligence a factual cause of harm to Plaintiff Keith Spencer?" Jury Verdict Form, 1/31/2019, at 1. Likewise, the slip asked the jury the same two questions regarding PJB– "Was Defendant Philadelphia Joint Board negligent?" and if so, "Was Defendant, Philadelphia Joint Board's

negligence a factual cause of harm to Plaintiff Keith Spencer?" ***See id.***, at 2. We reiterate that the verdict slip was drafted with the consultation of all counsel. Moreover, once the jury's verdict was read in open court, the parties did not request a clarification or ask for any additional special interrogatories. Given the inherent ambiguity in the verdict slip, the issue is which party suffers from the failure to take steps to clarify the verdict slip.

Pursuant to ***Halper*** and ***Shiflett II***, we cannot agree with the trial court that Spencer should be precluded from recovery under the theory of vicarious liability simply because the jury was not asked to make specific findings that Tina was acting as an employee/agent. The jury returned a general verdict in favor of Spencer. A special interrogatory on the verdict sheet indicating whether Tina was acting within the course and scope of her employment would have eliminated the predicament we are now faced with, as it would have clarified whether the jury's award of damages was for PJB's vicarious liability for Tina's negligence or its own negligence. However, we cannot disregard the fact that Spencer was the verdict winner and he receives the benefit of doubt in terms of these ambiguities in the verdict sheet. PJB's failure to request a special interrogatory allocating damages based on individual or vicarious liability, despite several opportunities to do so, constitutes waiver. As indicated in ***Halper*** and ***Shiflett II***, we will not shift the burden based upon PJB's failure to request a clarifying special interrogatory.

Therefore, we constrained to conclude the trial court erred in failing to grant Spencer's motion to mold the verdict pursuant to the Fair Share Act, as the jury's general verdict warranted a finding that PJB was vicariously liable for Tina's negligence and therefore, the theory of joint and several liability applied. PJB's and Tina's combined liability exceeded the 60% liability threshold. **See** 42 Pa.C.S.A. § 7102(a.1)(3)(iii). Accordingly, we reverse the court's denial of Spencer's post-trial motion and remand for further proceedings as PJB and Tina remain jointly and severally liable for Spencer's injuries.

Nevertheless, assuming *arguendo* that the jury's verdict did not demonstrate PJB was vicariously liable, we would have found the court erred in failing to grant the motion to the mold the verdict as the question of whether the Fair Share Act applies to the present matter remains.

In determining the scope of the Fair Share Act, we must always remember that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). **See also Green v. Pa. Prop. & Cas. Ins. Guar. Ass'n**, 158 A.3d 653, 662 (Pa. Super. 2017). "The best indication of legislative intent is the plain language of the statute." **Roverano v. John Crane, Inc.**, 226 A.3d 526, 535 (Pa. 2020) (quotation marks and citations omitted). Moreover, "[w]e review a question of statutory interpretation *de novo*, and the scope of

our review is plenary." ***Frempong v. Richardson***, 209 A.3d 1001, 1009 (Pa. Super. 2019).

To understand the intent behind the Fair Share Act, we must understand what motivated the legislature to enact it. For most of the history of this Commonwealth, our courts adhered to the legal doctrine that if a plaintiff's negligence contributed even one percent to his injuries, the plaintiff was completely barred from holding any other party liable. ***See Elder v. Orluck***, 515 A.2d 517 (Pa. 1986).

The Fair Share Act's predecessor, the Comparative Negligence Act[22] replaced the harsh common law doctrine of contributory negligence. The comparative negligence statute "provide[d] a more reasonable approach to issues of liability and insure[d] that an injured plaintiff will recover against a negligent defendant or defendants even though plaintiff's negligence contributed to the accident in an equal or lesser way[,] "but the plaintiff's recovery was reduced based on his negligence. ***See id.***, at 524. Moreover, the former statute provided that, under the rule of joint and several liability, the plaintiff may recover the full amount of the allowed recovery from any defendant against whom the plaintiff is not barred from recovery. ***See Jazbinsek v. Chang***, 611 A.2d 227, 230 (Pa. Super. 1992).

---

[22] ***See*** July 9, 1976, P.L. 855, No. 152.

In 2002, the legislature amended the Comparative Negligence Act to modify its expansion of joint and several liability into cases involving contributory negligence. ***See Harsh v. Petroll***, 887 A.2d 209, 218 n.19 (Pa. 2005). ***See also*** Act of June 19, 2002, P.L. 394. However, the amendment was subsequently found to be unconstitutional as violative of the single-subject rule. ***See DeWeese v. Weaver***, 880 A.2d 54 (Pa. Cmwlth. 2005).

The statute was thereafter re-enacted as the Fair Share Act, effective June 28, 2011.

We now turn to the relevant language of Fair Share Act:

**(a) *General rule. —*** In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

***(a.1) Recovery against joint defendant; contribution.***

(1) Where recovery is allowed against more than one person, including actions for strict liability, and where liability is attributed to more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of that defendant's liability to the amount of liability attributed to all defendants and other persons to whom liability is apportioned under subsection (a.2).

(2) Except as set forth in paragraph (3), a defendant's liability shall be several and not joint, and the court shall enter a separate and several judgment in favor of the plaintiff and against each defendant for the apportioned amount of that defendant's liability.

42 Pa.C.S.A. § 7102 (emphasis added).

Immediately, we note the structure of the statute. Subsection (a) provides the "general rule" that a plaintiff's contributory negligence is not a complete bar to recovery. Instead, the "general rule" provides for two scenarios based upon comparing the plaintiff's negligence with that of the defendants. First, if the plaintiff's negligence was a greater cause of her injuries than the defendants' negligence, then the plaintiff's recovery is barred. Second, if the defendants' negligence was a greater cause of the plaintiff's injuries than the plaintiff's own negligence, then the plaintiff's recovery against the defendant will be reduced in proportion to the amount of the plaintiff's negligence. Importantly, neither scenario deals with the circumstances present here, where there has been no allegation of a plaintiff's own negligence, let alone no jury finding of contributory negligence.

The statute then proceeds to subsection (a.1). Read in context, this subsection only applies when the plaintiff has overcome the obstacles to recovery set forth in section (a). Significantly, subsection (a.1) begins with the phrase, "[w]here recovery *is allowed* against more than one person …" (emphasis added).

This limited construction is also supported by the history of the Comparative Negligence Act. "Joint and several liability as a principle of recovery for an indivisible injury caused by multiple tortfeasors lies at the very heart of the common law of tort, and also has a solid foundation in

Pennsylvania's statutory law." ***Carrozza v. Greenbaum***, 916 A.2d 553, 565 (Pa. 2007) (citations omitted). "The policy justification for allocating 100 percent liability (from the plaintiff's perspective) to one who bears only, say, 40 percent of the responsibility is that, as between an innocent injured party and a culpable defendant, the defendant should bear the risk of additional loss." ***Maloney v. Valley Med. Facilities, Inc.***, 984 A.2d 478, 489 (Pa. 2009) (citation omitted). The Comparative Negligence Act provided "a method for determining how much responsibility should be allocated to the defendant *in light of the plaintiff's conduct*." ***Krentz v. Consol. Rail Corp.***, 910 A.2d 20, 28 (Pa. 2006) (emphasis added). Therefore, the legislature, in enacting the Comparative Negligence Act, merely sought to modify which parties bear the risk of additional losses in cases where the plaintiff was not wholly innocent.

In contrast, there is no indication the legislature intended to make universal changes to the concept of joint and several liability outside of cases where a plaintiff has been found to be contributorily negligent. "We should be and are reluctant to disturb the elemental doctrine of joint and several liability in the absence of express direction from the legislature." ***Carrozza***, 916 A.2d at 565–566 (citation omitted).

The subsequent enactment of the Fair Share Act does not alter our conclusion. As noted, the "general rule" of the Fair Share Act continues to be focused on cases where a plaintiff is found to have negligently contributed to her own injuries. The addition of subsection (a.1) does not clearly or explicitly

expand the scope of the Fair Share to include cases where the plaintiff has not been found to be contributorily negligent. Therefore, for the Fair Share Act to apply, the plaintiff's negligence must be an issue in the case.

Here, as noted above, Spencer's fault was never alleged or raised during litigation, an instruction was not provided to the jury on the matter, nor was a question about Spencer posed to the jury on the verdict form. Rather, it was an undisputed fact that Spencer was "lawfully walking in the crosswalk at the time of the accident[,]" and his actions were not a contributing factor to the incident. Trial Court Opinion, 6/24/2019, at 3. Moreover, Tina and PJB never raised a defense at trial that Spencer may have contributed to his injuries.

As such, we decline to disregard the plain language of the statute. The Fair Share Act concerns matters where a plaintiff's own negligence may have or has contributed to the incident; that set of circumstances does not apply to the present matter. While this case involved multiple tortfeasors, it would have been improper to apply a statute that addresses the scenarios where a claimant may have contributed to the accident and the possible preclusion of recovery based on a plaintiff's own negligence.

Therefore, as an alternative basis, we would have concluded the trial court erred in applying the Fair Share Act to the present matter because Spencer was never alleged or found to have contributed to the accident. Accordingly, PJB and Tina would still be jointly and severally liable for Spencer's injuries. **See Baker v. ACandS**, 755 A.2d 664, 669 (Pa. 2000)

(under the theory of joint and several liability, a plaintiff "may recover the entire damages award from only one of the joint tortfeasors.").

## II. Section 1547 Argument

As an alternative argument, Spencer claims the court erred in failing to mold the entire verdict against PJB because it is jointly and severally liable pursuant to a section of the Pennsylvania Motor Vehicle Code, 75 Pa.C.S.A. § 1574.[23] *See* Brief of Appellant, at 37. Spencer points to ***Shomo v. Scribe***, 686 A.2d 1292 (Pa. 1996), for the principle that Section 1574 imputes joint and several liability on someone who commits a Section 1574 violation with the driver for any damages caused by the driver's negligence. ***See*** Brief of Appellant, at 38. ***Shomo*** provides that "for effective enforcement of the summary offense provision of [S]ection 1574(a), it must be shown that the owner or controller knew, or had reason to know, at the time he entrusted his vehicle to another, that the driver he was authorizing or permitting to drive

_____

[23] Section 1574 of the Pennsylvania Motor Vehicle Code provides:

(a) General rule. — No person shall authorize or permit a motor vehicle owned by him or under his control to be driven upon any highway by any person who is not authorized under this chapter or who is not licensed for the type or class of vehicle to be driven.

(b) Penalty. — Any person violating the provisions of subsection (a) is guilty of a summary offense and shall be jointly and severally liable with the driver for any damages caused by the negligence of such driver in operating the vehicle.

75 Pa.C.S.A. § 1574.

his vehicle was unlicensed." ***Shomo***, 686 A.2d at 1295 (citations omitted). Spencer states both PBJ and Tina are jointly and severally liable because: (1) Tina either directly or indirectly permitted Cleveland to drive the car while intoxicated and without a license; and (2) PJB permitted Cleveland to operate the vehicle by not enforcing its policies and failing to supervise Tina's use of the car. ***See*** Brief of Appellant, at 39.

PJB responds by claiming Section 1574 does not apply to the case because the union and Tina offered evidence that they did not give Cleveland permission to drive the car. ***See id.***, at 24. Moreover, PJB states that evidence established that it provided the vehicle for the sole use of Tina and she was aware that she was prohibited from allowing any other individual to use the car. ***See id.*** PJB asserts that as a result, there cannot be a finding that it was in violation of Section 1574. Furthermore, PJB contends the Fair Share Act specifically sets forth the limited exceptions where joint and several liability apply, and those exceptions do not include Section 1574. ***See id.***, at 25-26.

As previously stated, we concluded that the jury's general verdict necessitated a finding that PJB was vicariously liable for Tina's negligence, and therefore, the theory of joint and several liability applied pursuant to the Fair Share Act. Accordingly, it would be redundant to decide whether the imputation of joint and several liability under Section 1574 applies to the present matter. Therefore, we need not address this claim further.

**III. Delay Damages Argument**

In Spencer's final argument, he contends the court erred in failing to award him the full measure of delay damages pursuant to Pennsylvania Rule of Civil Procedure 238. *See* Brief of Appellant, at 40. He notes that original process was first served on August 17, 2016 and August 20, 2016 and the defendants did not make any settlement offer until shortly before closing arguments on January 28, 2019. *See id.*, at 41. Spencer states that if we determine that PJB is jointly and severally liable for any reason, then the court committed an abuse of discretion in failing to award the entire measure of delay damages. *See id.*, at 42.

PJB counters Spencer's argument and states that the trial court properly determined that he was only entitled to delay damages from each defendant in accordance with the percentage of liability for each defendant as determined by the jury. *See* Brief of Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU, at 27.

Our standard of review concerning a motion for delay damages under Rule 238 is whether the court committed an abuse of discretion. *See Roth v. Ross*, 85 A.3d 590, 592 (Pa. Super. 2014). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Id.*, at 592-593.

The rule in question, Rule 238, provides, in relevant part, as follows:

> At the request of the plaintiff in a civil action seeking monetary relief for bodily injury, … damages for delay shall be added to the amount of compensatory damages awarded against each defendant or additional defendant found to be liable to the plaintiff in the verdict of a jury, in the decision of the court in a nonjury trial … and shall become part of the verdict, decision or award.

Pa.R.C.P. 238(a)(1)

As noted above, the court denied in part and granted in part Spencer's motion for delay damages. Specifically, the court found he was entitled to delay damages only as calculated from August 17, 2017 to January 28, 2019, and only as calculated on the compensatory damages for which PJB was deemed liable – 45%. The total amount of delay damages assigned to PJB was $453,872.69. The trial court explained its computation as follows:

> As stated in the Order, the denial was directed towards [Spencer]'s arguments that delay damages should be calculated on the full verdict amount, since (as [Spencer] argued in his Motion to Mold the Verdict) PJB would be liable for the entirety of the damages amount. The Court disagreed, stating that each defendant was only liable for delay damages on the amount of compensatory damages attributed to each based on the jury's apportionment of liability. Hence, PJB would only be liable for delay damages calculated on 45% of the total verdict amount, rather than 100%. As the Court read the Motion to only request delay damages against PJB and [Tina] (apparently an oversight), it did not award delay damages against [Cleveland]. [Spencer]'s Amended Delay Damages Motion sought to recover delay damages against him as well, but as explained above, the Court was not able to rule on this Motion before the Notice of Appeal was filed and our jurisdiction over the case was removed pursuant to Pa. R.A.P. 1701.

Trial Court Opinion, 6/24/2019, at 11 n.9.

- 57 -

Based on our conclusion that PJB was joint and severally liable, we are constrained to disagree with the court's determination. We are guided by the following:

> [A]s a general precept[,] Rule 238 damages awarded against all defendants in a negligence action are properly aggregated with the verdict such that the defendants are jointly and severally liable for the aggregated delay damages. The fact that delay damages under Rule 238 may be calculated in the first instance on an individualized basis before being aggregated with the general liability verdict does not alter the analysis.

***Allen v. Mellinger***, 784 A.2d 762, 766 (Pa. 2001).

Accordingly, we are compelled to reverse that portion of the trial court's order that apportioned delay damages to each defendant, and remand for the recalculation of damages.

## IV. Tina's Sufficiency Arguments

In her first, second, and third arguments, Tina contends the trial court erred in failing to grant her post-trial motion for JNOV because there was insufficient evidence to support *prima face* cases of negligence or negligent entrustment against her. ***See*** Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 22, 30, 36. Tina has a high hurdle to clear to get the trial court's order reversed: "We will reverse a trial court's grant or denial of a JNOV only when we find an abuse of discretion or an error of law." ***Reott v. Asia Trend, Inc.***, 55 A.3d 1088, 1093 (Pa. 2012).

> When reviewing the propriety of an order granting or denying judgment notwithstanding the verdict, we must determine whether there is sufficient competent evidence to sustain the verdict. We must view the evidence in the light most

favorable to the verdict winner and give the verdict winner the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences. We apply this standard in all cases challenging the grant of a motion for J.N.O.V.

Pennsylvania law makes clear that a judgment notwithstanding the verdict is proper only in clear cases where the facts are such that no two reasonable minds could disagree that the verdict was improper. Questions of credibility and conflicts in evidence are for the fact-finder to resolve. This Court will not substitute its judgment based upon a cold record for that of the fact-finder where issues of credibility and weight are concerned.

***Dubose v. Quinlan***, 125 A.3d 1231, 1237-1238 (Pa. Super. 2015) (quotation and internal citations omitted).

We begin our analysis by noting that all three of Tina's challenges to the sufficiency of the evidence are premised on accepting her trial testimony as true, while ignoring contradictory testimony. These arguments ignore our standard of review. Further, as we will demonstrate, the record amply supports the jury's verdict.

Tina first focuses on the pure negligence verdict. A negligence cause of action has several elements:

To establish a cause of action sounding in negligence, a party must demonstrate they were owed a duty of care by the defendant, the defendant breached this duty, and this breach resulted in injury and actual loss.

[T]he determination of whether an act or failure to act constitutes negligence, of any degree, in view of all the evidence has always been particularly committed to determination by a jury. It is an issue that may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find negligence.

*Snead v. SPCA*, 929 A.2d 1169, 1183 (Pa. Super. 2007) (citations omitted; brackets in original).

Tina argues the uncontroverted evidence established that she was not the driver of the PJB car at the time of the accident. Rather, she continues to assert that Cleveland took the keys and drove the company car without her knowledge or permission and his negligent driving was the sole cause of Spencer's harm. *See* Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 23. Tina claims that based on the facts, she did not have a duty nor did she breach any duty. *See id.*, at 24. In support of her argument, Tina relies on her own testimony at trial as well as Cleveland's statements concerning his procurement of the keys without her knowledge or permission, his intoxication at the time of the accident, and his admission at trial that he was at fault. *See id.*, at 25-29.

While Tina's trial testimony certainly supports her argument, the jury was not required to find it credible. The jury was entitled to find that Tina's self-interest affected this testimony. Further, it is undisputed that Tina was not immediately truthful with PJB about the circumstances of the accident. Tina explained that she was not intentionally deceitful, but again, the jury was not required to credit this exculpatory testimony.

There was also significant testimony that directly contradicted Tina's testimony. Tina admitted that she and Cleveland had only one car – the company car. *See* N.T., 1/23/2019 a.m., at 114. Cleveland's willingness to

move the car for a minor reason on the night of the incident also implies a history of permissiveness in using the car. Finally, Cheryle Spencer testified that she had often observed Cleveland driving the car in the past. *See* N.T., 1/23/2019 a.m., at 78, 82. Under these circumstances, we cannot conclude that the trial court erred in refusing to grant Tina JNOV on the pure negligence verdict.

In her second argument, Tina challenges the negligent entrustment verdict. The tort of negligent entrustment is set forth in Section 308 of the Restatement (Second) of Torts:

> § 308 Permitting Improper Persons to Use Things or Engage in Activities
>
> It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

Restatement (Second) of Torts § 308 (1965).

"Under a theory of negligent entrustment, liability is imposed upon a defendant because of his or her own actions in relation to the instrumentality or activity under his or her control. The entrustor's liability is not dependent on, derivative of, or imputed from the entrustee's actual liability for damages." *Ferry v. Fisher*, 709 A.2d 399, 403 (Pa. Super. 1998) (citations omitted). "However, our cases do require that the entrustee be causally negligent before the entrustor may be held liable through negligent entrustment." *Christiansen v. Silfies*, 667 A.2d 396, 400 (Pa. Super. 1995).

Tina claims that even if "the jury did find that Tina Johnson permitted her husband to drive the vehicle, simply allowing him to drive was insufficient to find that she negligently entrusted him with the car and that such negligence was the cause of the harm." *See id.*, at 31. She relies on *Gibson v. Bruner*, 178 A.2d 145 (Pa. 1961), to support her claim.

Tina alleges the court opined that there was evidence Cleveland "often drove the car" with her "knowledge, if not her permission." Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 33. Tina contends that assuming the jury ignored the evidence that Cleveland did not have permission and believed his wife allowed him to drive, "there was no evidence that she entrusted the vehicle to [Cleveland] when he took the vehicle at the date and time of the accident" and "that she knew or should have known that [Cleveland] was incompetent to drive the vehicle on that date, or at any time, by reason of intoxication or otherwise." Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 33-34 (quotations marks omitted).

She relies on her own testimony that at the family gathering, she and Cleveland "exchanged a few words at most[,]" "she did not know how many drinks he had before arriving at her mother's house, and was not with him long enough to know if he was intoxicated." *Id.*, at 34. Moreover, she points to Cleveland's testimony, in which he stated that "he drank his last beer before he went into the house, that no one was drinking at the gathering, that at

most he exchanged a word with his wife, and there is no evidence that anyone was aware of his state when he took the car." ***Id.***

She further contends the mere fact that his "license had been suspended years ago was insufficient to support a negligent entrustment claim," and the accident was caused by his drunk driving, and not his lack of driving privileges. ***See id.*** Tina concludes that as a result, the trial court erred in failing to grant her motions for JNOV and a new trial. ***See id.***, at 35-36.

Viewing the evidence in the light most favorable to Spencer as the verdict winner, we concur with the trial court that there was sufficient evidence to support a finding that Tina had negligently entrusted Cleveland to drive her work car. A negligent entrustment cause of action required proof that: (1) Tina was the operator of the work vehicle, (2) Tina permitted Cleveland to use the car, and (3) Tina knew or had reason to know Cleveland intended to or was likely to use the car in a manner which would create an unreasonable risk of harm to others. ***See*** Restatement (Second) of Torts § 308.

Applying the elements to this case, we note the following: (1) the work vehicle was issued to Tina and she testified she used it for employment and personal reasons; (2) as explained by the trial court, there was ample circumstantial evidence that Cleveland serially drove the car with Tina's explicit or implicit knowledge despite the fact that he did not have a proper license; and (3) one can reasonably infer that the jury disbelieved Tina's testimony that she did not know her husband was intoxicated at the time of

the family gathering, and therefore, she had reason to know he would use the car in a manner which would create an unreasonable risk of harm to others. **See id.** Lastly, Cleveland was causally negligent for Spencer's injuries. **See Christiansen**, 667 A.2d at 400.

In her third challenge to the sufficiency of the evidence, Tina returns to the negligence cause of action and claims the trial court erred by denying JNOV because the jury's verdict that was based on a novel theory of negligence: the "keys on the counter or purse" or "accessibility" theory of negligence was invalid as a matter of law, and therefore, the verdict was supported by insufficient evidence. **See id.**, at 36. She states she did not leave the keys in the ignition or at a public place; rather, she left them in her mother's home during a private family get-together.

Tina asserts the court erred in denying JNOV because Spencer's theory of negligence on this basis is not recognized in Pennsylvania. **See id.** Tina contends that Pennsylvania law "does not impose a duty, nor permit a finding of negligence based on the allegation that Tina Johnson/any other person left car keys in a private, family home, where they could be accessed by a spouse or any other competent adult in these circumstances." **Id.**, at 37. She states that under Spencer's theory, every vehicle owner would have to keep his or her car keys on their person or inaccessible at all times, which would be an "absurd result." **Id.**, at 38. Tina further states that case law has held that "the mere fact that a vehicle owner leaves the vehicle accessible to a family

members or friend does not impose liability for harm caused by that driver."

*Id.*, at 38-39. She asserts she did not owe or breach a duty on this basis, and there was no evidence supporting a finding that her conduct in leaving the keys was a cause of Spencer's harm. *See id.*, at 40. Lastly, Tina argues the jury's acceptance of "keys on the counter or purse" theory rendered a verdict that was against the weight of the evidence. *See id.*, at 40-42.[24]

We agree with the trial court's conclusion. In her post-trial motion for JNOV, Tina alleged the jury's finding of liability was not supported by sufficient evidence because "Pennsylvania law does not and should not permit a finding of negligence based on the allegation that [Tina] or any other person left car keys where they could be accessed by a spouse or any other competent adult[,]" and in the present matter, "the trial testimony unequivocally established that Cleveland Johnson took the keys without the knowledge or permission of [Tina] (his wife) and [Tina] had made clear that [Cleveland] was not permitted to drive the car at any time." Motion for Post-Trial Relief of Defendant, Tina Gainer Johnson, 2/15/2019, at ¶ 3. However, as the court correctly points out, the verdict slip did not explain the exact theory the jury relied on to form its verdict, and Tina did not solicit the jury's rationale on the record or request special interrogatories on the matter. The parties were

---

[24] To the extent Tina raises weight arguments, we will address these assertions in the next section, which involves both Tina's and PBJ's weight claims.

disputing numerous theories of negligence. Therefore, contrary to Tina's assertion, the jury's verdict was not clearly based on a novel "accessibility" theory of negligence.

As such, we conclude the trial court did not err in denying Tina's post-trial motion for JNOV because the facts are such that no two reasonable minds could disagree that the verdict was improper. ***See Dubose***, 125 A.3d at 1237-1238.

## V. PJB's and Tina's Weight Argument

Both Tina and PJB contend that the trial court improperly denied their motions for post-trial relief based on the assertion that the verdict was against the weight of the evidence. ***See*** Brief of Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU, at 20; ***see also*** Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 42. PJB alleges "the percentage of liability apportioned to [PJB] when compared to the percentage of liability apportioned to co-defendant, [Cleveland], is against the weight of the evidence and resulted in a miscarriage of justice." Brief of Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU, at 20. PJB states that it was an error for the jury to allocate greater liability to it based upon a purported lack of oversight of the use of its vehicle than to Cleveland, who was drunk and took his wife's keys without her knowledge and permission and hit Spencer. ***See id.***, at 21.

Similarly, Tina contends the court erred by denying her a new trial because the jury's apportionment of only 36% liability to Cleveland was against the weight of the evidence given the record and his admissions that he took the car without Tina's knowledge or permission. *See* Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 42-48. Tina states the court merely speculated that the jury found she had negligently authorized Cleveland to drive the PJB car and that he used the car with her express and implied permission, and such a finding was against the weight of the evidence. *See id.*, at 43.

When presented with a challenge to weight of the evidence claim, our standard of review is well-settled.

Initially, we note the following relevant legal precepts:

> Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

> The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court may award a judgment notwithstanding the verdict or a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met,

appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. When a fact finder's verdict is so opposed to the demonstrative facts that looking at the verdict, the mind stands baffled, the intellect searches in vain for cause and effect, and reason rebels against the bizarre and erratic conclusion, it can be said that the verdict is shocking.

However, [i]f there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm. An appellant is not entitled to a new trial where the evidence presented was conflicting and the fact-finder could have decided in favor of either party.

**McFeeley v. Shah**, 226 A.3d 582, 594 (Pa. Super. 2020) (citations and quotation marks omitted).

In support of their weight arguments, PJB and Tina point to the following facts: at the time of the accident, Cleveland was the sole driver of the vehicle, he was intoxicated, he did not possess a license, and he was not authorized by PJB to drive the vehicle. In addition, they note Cleveland's assertions at trial that he was the only one at fault, and that the others should bear no blame.

Moreover, both PJB and Tina rely on **Thompson v. City of Philadelphia**, 493 A.2d 669 (Pa. 1985), in an attempt to bolster their argument that the jury's apportionment of liability was against the weight of the evidence, and warranted a new trial. **See** Brief of Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU, at 21; **see also** Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 45.

Tina and PJB also argue that **Thompson** stands for the theory that the driver of a vehicle that causes an accident should bear more liability than any other party that is involved in the matter. Turning to the present matter, since Cleveland did not bear the greatest percentage of liability, PJB and Tina contend that the jury's verdict was against the weight of the evidence.

In disposing of PJB's and Tina's weight arguments, the trial court held that the jury had properly considered the evidence when they imputed greater liability on PJB than on Cleveland. The court highlighted the following evidence: (1) PJB had given Tina a company vehicle without first checking her background; (2) PJB provided all employees vehicles unless specifically given reason not to do so; (3) Cleveland was known to frequently drive Tina's company vehicle; and (4) PJB did not conduct mileage tracking or auditing and instead relied on "the honor system" for enforcing vehicle use. Trial Court Opinion, 6/24/2019, at 15-16.

Additionally, the trial court pointed to evidence which showed that PJB did not implement any safety measures aside from "periodic reminders of the usage policies and instructions that employees should wear their seatbelts and use other basic road safety practices." **Id.**, at 16. The trial court further elaborated that this complete lack of oversight regarding vehicle allocation and usage stemmed from PJB's belief that "they would find out" about any misuse because Philadelphia was "a small town." **Id.**

Lastly, the court opined that "overturning a jury's verdict is a drastic measure" and should not be done unless "an egregious error is manifest or palpably apparent." *Id.*, at 15 (internal quotation marks omitted). In considering PJB's lack of enforcement of company car policies and safety measures, the trial court held that the jury's decision that PJB shared the greatest percentage of fault was supported by evidence and was reasonable. Therefore, it concluded it did not abuse its discretion by denying PJB's and Tina's motions for a new trial.

As noted above, both PJB and Tina cite *Thompson* in support of their argument that the driver who causes an accident should bear more liability than any other party. However, contrary to their assertion, *Thompson* does not stand for the notion that a new trial must be granted when the driver does not bear the largest share of liability.

By way of background, *Thompson* arose from an automobile accident, where a furniture truck driver negligently exited an interstate. Unable to stop, the driver barreled through a guardrail, and toppled off an overpass onto the highway below, crushing and killing the decedent. The plaintiff, the administratrix of the estate of the decedent, subsequently brought suit against the truck driver, his employer, the City of Philadelphia, and the Commonwealth of Pennsylvania. After a jury trial, the Commonwealth and the

City were each found 35% liable, while the driver and his employer, together, were found only 30% liable.[25]

The trial court granted a new trial on apportionment of liability alone. The court held that the jury's apportionment of liability was against the weight of the evidence where the driver failed to notice or follow the clearly visible directional signs, traffic speed signs, and multiple stop signs.

On direct appeal, a panel of this Court reversed, explaining that expert testimony at trial proved the intersection's poor design, and justified the jury's verdict. The panel "determined that the trial court's order exceed[ed] the limited standards for the grant of a new trial because of the weight of the evidence." **Thompson**, 493 A.2d at 672 (citation and quotation marks omitted).

On allocator review, the Pennsylvania Supreme Court explained the differences between the standard of review applied by this Court and how it interpreted the standard of review. It agreed with this Court "that the power to grant a new trial is as inherent in a trial court for the apportionment of liability as the power exists for all the traditional reasons for granting a new trial." *Id.* However, the Supreme Court determined that in measuring whether

_____

[25] At trial, the plaintiff averred that the Commonwealth had failed to exercise reasonable care when posting traffic signs on the interstate, which resulted in the driver being confused, and ultimately caused the accident. Although there were numerous traffic signs posted on the exit ramp, expert testimony at trial helped show that poor design may have resulted in the driver not seeing the signs.

a new trial should be granted, the Superior Court panel erroneously "adopted the view that a grant is a most unusual judicial act and if there is any credible evidence which under any reasonable view supports the jury's findings the verdict should be sustained." *Id.* The Supreme Court held:

> In reviewing the entire record to determine the propriety of a new trial, an appellate court must first determine whether the trial judge's reasons and factual basis can be supported. Unless there are facts and inferences of record that disclose a palpable abuse of discretion, the trial judge's reasons should prevail. It is not the place of an appellate court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function.

*Id.*, at 673.

The Supreme Court then cited to the evidence and rationale offered by the trial court for granting a new trial. *See id.,* at 673-674 ("this court refuses to accept the jury's apportionment of damages to the defendant [driver] where he failed to follow posted traffic directional signs, ignored posted traffic speed signs, and states that he did not see either one of two stop signs even though the evidence clearly establishes that he should have seen those signs.").

In reversing the Superior Court panel's decision, the Supreme Court opined:

> The Superior Court panel did not find that these facts were not of record or that if true they would not support a conscious shocking paradigm. The Superior Court instead, countered the argument by finding that expert testimony suggested that the highway junction was ill designed and therefore the jury could find justification for their apportionment of liability. The jury could and did do exactly that. That, however, begs the question before us; the question

being whether the trial judge's reasons for his act in granting a new trial were justified. If he was supported by facts of record, the very point of his grant is that, notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. We cannot find it wrong to believe that an inattentive driver barreling into a marked exist ramp at 40-45 miles an hour, who did not stop for a clearly visible stop sign because he did not see it, and who was unable to control his vehicle at the intersection, is more at fault than those who maintain the road he was not sure he was on.

***Id.,*** at 674 (quotation marks omitted).

Turning to the present matter, although both cases concern a motor vehicle accident, it is evident that ***Thompson*** is distinguishable based on the procedural posture of this case. Here, unlike in ***Thompson***, the trial court denied the motions for a new trial, finding that the jury's apportionment of fault was not manifestly and palpably against the weight of the evidence. As noted above, the court concluded the verdict reasonably flowed from the actions and omissions of both PJB and Tina, which resulted in Cleveland driving the vehicle on the night in question. As a result, the court found it was not unreasonable for a jury to decide that if PJB would have enforced stricter supervision of the company vehicle, Husband would not have been in control of the vehicle on the night in question.

We are reminded that it is not the place of this Court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function. ***Id.***, at 673.

We now turn to the record, which reveals the following. At trial, Spencer presented evidence of PJB's complete lack of oversight over Tina's fitness as a possessor of a company vehicle. Through questioning, Spencer demonstrated that PJB's policies surrounding the employee vehicles were extremely lax in nature. Aside from making sure an employee had a valid driver's license, PJB did little to no investigation into the employee's prior record as a driver or overall suitability for having control over a vehicle. Rather, according to PJB's manager, Fox, the company vehicles were simply given to all employees as a right unless they somehow proved otherwise unfit to have one. *See* N.T., 1/22/2019 p.m., at 51. Moreover, Fox indicated that whether an employee already had a personal car was "irrelevant" to the company's decision to give someone a car. N.T., 1/22/2019 p.m., at 67.

Fox further described the only true requirements for an employee getting a vehicle as follows: "what their work product is like, what members say about them, what results they produce, what their work ethic is, if we have any issues, if there are any complaints." N.T., 1/22/2019 p.m., at 49. As a result of this organization's approach, PJB did not evaluate Tina's fitness for having a company car, and thus failed to discover that she had previously had her license suspended, and that providing her with a vehicle may have been a risk.

Additionally, once employees were provided with company vehicles, they were allowed to possess the vehicle at all times, but were not supposed

to drive the cars for personal reasons. However, PJB administered minimal oversight of vehicle usage by employees. For example, PJB did not record or audit mileage usage, or even conduct any sort of periodic or surprise inspections. Rather than attempting to ensure that employees only drove their vehicles for work purposes, PJB simply used "the honor system," and hoped that employees would follow the rules. N.T., 1/22/2019 a.m., at 107.[26]

Moreover, PJB held regular meetings as well as retreats where all "policies and procedures are gone over and thoroughly given[.]" N.T., 1/25/2019 a.m., at 23.[27] However, PJB had no employee handbook or manual, and gave little to no vehicular safety training. PJB had a two-page vehicle policy document, drafted by Saldana and Fox, that was reviewed orally with employees when they received the car and at meetings. **See** N.T., 1/22/2019 a.m., at 90-91. PJB failed to produce any documentation at trial that Tina had

---

[26] Fox testified:

> We don't monitor our employee's use of the vehicles. No one gets shadowed. No one gets followed. We know what their work is. We would know very quickly if someone was not doing the work, if they were not showing up where they were supposed to be showing up…. So we never had a program. I mean, that's the general, reasonable protocol that all unions use. If you don't trust your rep to drive your car, you certainly don't trust your rep to service your members.

N.T., 1/22/2019 p.m., at 53.

[27] Minter testified the retreats were mandatory, but employees were excused if they had a personal health crisis or were "caught up in negotiations[.]" N.T., 1/25/2019 a.m., at 23.

signed acknowledging the policy, or even indicated that she had attended any of those meetings when the vehicle policy was discussed. ***See id. See also*** N.T., 1/25/2019 a.m., at 46-47; N.T., 1/28/2019, at 13.

Furthermore, rather than focusing on any of these safety measures, the company instead concentrated on complying with IRS and DOL regulations, and stood behind the creed that because Philadelphia is "a small city," PJB simply would find out "sooner or later" about any misuse of the vehicles, including unauthorized use by a family member. N.T., 1/22/2019 p.m., at 57.

Under these circumstances, we cannot conclude the trial court abused its discretion in refusing to grant a new trial. The jury could reasonably find that PJB's failure to manage Tina led to her allowing Cleveland to regularly driving the company vehicle without their knowledge or authorization. It even resulted in Tina's failure to report to PJB that the company vehicle was impounded after the accident because, as Tina testified, "there was no need to notify [PJB] for that." N.T., 1/22/2019 a.m., at 74.[28]

As for Tina's liability, an examination of the record not only explains how a jury could have found her negligent, but also overwhelmingly justifies the jury's apportionment of liability to her. First, there was the evidence

---

[28] It also merits mentioning that after the accident, PJB did not terminate Tina's employment with the union, but merely suspended her for two weeks and revoked her company car privileges. Additionally, PJB did not press charges against Cleveland for theft of the vehicle even in light of Tina's explanation that she did not give me permission to drive the car.

demonstrating Cleveland's extensive usage of the vehicle. While Cleveland and Tina both admitted that he did have her permission to drive the vehicle in the past, they maintained that this permission only applied to rare occasions for unidentified emergency situations. *See* N.T., 1/23/2019 a.m., at 38; N.T., 1/24/2019 a.m., at 24-28. Nevertheless, their portrayal of his use of the vehicle was contradicted by Spencer's sister. Cheryle testified that she had personally seen Cleveland driving the car "[a]ll the time[,]" both with and without Tina in the vehicle. N.T., 1/2/2019 p.m., at 78.[29] The jury was free to accept or reject the testimony by these witnesses, and it is obvious the jury found Cheryle's testimony more credible than Cleveland's and Tina's statements.

Second, there was the evidence of Tina's attempt to hide the accident from PJB. The accident occurred on a Thursday night. Tina did not immediately contact PJB to inform them about the accident. The following day, Tina tried to cover-up the incident to PJB by telling Saldana that the vehicle had been impounded due to unpaid parking tickets. *See* N.T., 1/22/2019 p.m., 16-20. Tina also went into the office without telling anyone in order to obtain a second copy of the car registration that she kept in her office. She needed the car registration to get the car released from the impound lot. *See* N.T., 1/23/2019

---

[29] Cheryle Spencer provided an affidavit in response to a pleading. *See* N.T., 1/23/2019 p.m., at 85-86. In the affidavit, she averred she observed Cleveland and/or Cleveland and Tina driving the car at least 100 times. *See id.*, at 90.

a.m., at 80. When PJB questioned Tina after finally being notified about the crash by police officers who showed up at the office, Tina did not tell Fox the severity of Spencer's injuries. *See* N.T., 1/22/2019 p.m., at 62-63, 66.

We reiterate "it was solely for the [jury], as the finder of fact, to determine the credibility of witnesses and to resolve any conflicts or inconsistencies in the evidence." *Commonwealth v. Upshur*, 764 A.2d 69, 74 (Pa. Super. 2000) (citation omitted). The jury was free to accept all, some, or none of the testimony presented to them. Accordingly, as *Thompson* sets forth, we conclude the record supports the trial court's analysis that: (1) PJB's lack of enforcement of company car policies and safety measures and supervision over the vehicles reasonably led to the jury's decision that PJB shared the greatest percentage of fault, which finding was supported by evidence and was reasonable; and (2) the evidence could reasonably support a finding that Tina had negligently authorized Cleveland to drive the PJB car and that he used the car with her express and implied permission. While Cleveland may have been the driver of the vehicle that struck Spencer, his fault did not erase the negligent acts of PJB and Tina that contributed to the incident. Therefore, we conclude the trial court did not act capriciously or abuse its discretion in determining that the verdict was not against the weight of the evidence. Accordingly, PJB's and Tina's weight claims merit no relief.

**VI. Remittitur Argument**

Lastly, PJB and Tina both argue the court erred in denying the request for a remittitur. They contend the court erred by denying a new trial on damages, or a substantial remittitur, because the over $12,000,000 verdict was against the weight of the evidence, manifestly excessive, and not supported by credible evidence since there was no expert medical testimony on life expectancy and other matters. *See* Brief of Appellee/Cross-Appellant, Philadelphia Joint Board Workers United, SEIU, at 26-27; *see also* Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 48-51. Tina also points out that Spencer's life care planning expert, Nurse Masterson, testified to alternate plans for Spencer's life which she projected for alternative life expectancies of ages 70 and 82, but Nurse Masterson specifically stated she would not give an opinion on life expectancy as it was not within her expertise. *See id.*, at 52.

Moreover, Tina contends there was no evidence to support the court's instruction on life expectancy because there was no expert medical testimony on the subject. *See id.*, at 53. She states the charge was based upon general tables that have no connection with Spencer's injuries from the accident and his actual medical condition, and therefore, this evidence cannot support the damages award. *See id.*, at 54.

Tina further argues that the court erred in opining that a jury may decide on a plaintiff's life expectancy without expert testimony because the impact of a plaintiff's serious medical condition on his or her life expectancy would not

be within the common knowledge of a juror. *See id.*, at 54-55. In this regard, she alleges that the court's reliance on *Helm v. Eagle Downs-Keystone Racetrack*, 561 A.2d 812, 813 (Pa. Super. 1989), is misplaced because, as she contends, *Helm* is not controlling. Tina specifically asserts *Helm* does not stand for "the proposition that a jury's award for future medical and noneconomic damages can be sustained where the award is based solely upon a jury instruction as to the life expectancy tables, and in the absence of any life expectancy testimony by medical experts." Brief for Designated Cross-Appellant/Appellee, Tina Gainer Johnson, at 55.

Tina also asserts the award was excessive because of "the disparity between the amount of the out-of-pocket expenses and the amount of the verdict." *Id.*, at 57. Tina states the parties stipulated that the amount of past medical bills paid was $683,311.47 and yet, the verdict was more than twelve times that amount for future medical expenses and non-economic damages. *See id.*, at 57-58. Lastly, she argues the verdict was so grossly excessive that it amounted to an award of punitive damages that violated basic fairness and due process rights. *See id.*, at 58-59.

We begin with our well-settled standard of review:

> Our standard of review in considering the reversal of a trial court's order denying a remittitur is to determine whether the trial court abused its discretion or committed an error of law in reaching such decision. In that regard, this Court, in *Mecca v. Lukasik*, 366 Pa. Super. 149, 530 A.2d 1334 (Pa. Super. 1987), discussed the factors to be considered in determining whether or not a verdict is excessive:

> The grant or refusal of a new trial because of the excessiveness of the verdict is within the discretion of the trial court. This court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. We begin with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive. A court may consider the following factors, *inter alia*:

> > (1) the severity of the injury; (2) whether the Plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the Plaintiff (and, herein, the court pointed out that where the injury is manifested by broken bones, disfigurement, loss of consciousness, or other objective evidence, the courts have counted this in favor of sustaining a verdict); (3) whether the injury will affect the Plaintiff permanently; (4) whether the Plaintiff can continue with his or her employment; (5) the size of the Plaintiff's out-of-pocket expenses; and (6) the amount Plaintiff demanded in the original complaint.

***Paliometros v. Loyola***, 932 A.2d 128, 134-35 (Pa. Super. 2007) (some citations omitted).

Here, the trial court discussed those "excessive" factors and found the following:

> At trial, the Court gave the jury Standard Civil Instruction 7.240, which gives the average life expectancy for the plaintiff's age and demographic group (in this case, 26.5 additional years). It also notes that the jury is free to find that the life expectancy would be longer or shorter based on considerations like the plaintiff's health status.

> …

> In this case, the jury awarded the stipulated amount for the past medical expenses, but also awarded $7.3 million for future

- 81 -

medical expenses and $5 million for noneconomic damages. [PJB and Tina] aver these amounts are excessive on their face, and that the future medical expenses award is unfounded in the absence of expert testimony on life expectancy. Firstly, we address the claim that the verdict is excessive. Looking to the factors enumerated above, we note that [Spencer]'s traumatic brain injury has left him in a wheelchair, unable to attend to his basic daily needs, and that he now suffers recurrent seizures that at one point resulted in hospitalization and medical induction of a coma and mechanical ventilation. He is unaware of his deficits and diminished capabilities, a factor which makes it particularly important that he receive constant supervision and procession care. He also needs frequent doctor visits and medication management, and he has endured frequent hospitalizations. He is also at heightened risk for wounds and infections due to his wheelchair and diaper use, and he suffers osteoporosis that is caused by his anti-seizure medication. According to the expert report of Dr. Guy Fried, [Spencer] reported being able to walk for miles and go dancing every weekend before his injury; now, he can walk perhaps 100 feet with assistance and a rolling walker and is at high risk for fall injuries. He cannot stand independently or drive. His short-term memory is impaired. Dr. Fried opined that his injuries were serious and permanent, and that he would need medical care in a facility setting for the rest of his life.

[Spencer]'s injuries are physically manifested, rather than being alleged only through subjective testimony, as his medical records and test results show. Gainful employment is clearly out of the question. His past medical expenses were stipulated to as greater than $680,000. Expert life-care planner Nurse Masterson calculated his costs of living to the age of 70, and separately to the age of 82, both for in-home care and facility care (but excluding medication costs). She opined that, if he lived only to age 70, his minimum living costs would exceed $3million; if he lived to age 82, his costs were estimated at $6.8 million and $7.3 million.

Furthermore, Dr. Fried's report states that [Spencer] reported nonstop, aching pains in his neck, back, arms, and legs, and that he had never had chronic pains prior to the accident. He also has losses of sensation and diminished eyesight. He suffers depression due to his awareness of his loss of quality of life. He reported being a previously active person in reasonable health

who played with his children and children around his neighborhood, and who enjoyed basketball and football.

For these reasons, this Court finds the jury's damages award was not so excessive as to shock our sense of justice. The award for future care costs is not excessive on its face because it accords with Nurse Masterson's careful accounting of costs, both for in-home and facility care, including costs of diagnostic tests, mobility aids and home modifications, physical/occupational/cognitive therapies, nursing services, and specialized day programs for patients with brain injuries. Additionally, we observe that [Spencer]'s medication costs (which were explicitly omitted from calculations) would significantly add to Nurse Masterson's estimates. We find the award for noneconomic damages is not excessive because [Spencer]'s quality of life has been drastically reduced, and he is no longer able to live as an independent, active person. For the rest of his life, he will need to rely on others to move him around, feed him, clean him, and attend to his medical needs, and he lives in constant pain.

Lastly, we reject [PJB's and Tina's] claim that the award for future medical costs is improper because [Spencer]'s experts did not opine on his life expectancy. A jury may decide on a plaintiff's life expectancy without expert testimony. *See **Helm v. Eagle Downs–Keystone Racetrack***, 561 A.2d 812, 813-14 (Pa. Super. Ct. 1989) (lay testimony of diminished quality of life, along with approved mortality tables, the appropriate considerations for a jury to determine life expectancy); *see also* SSJI 7.240 Subcommittee Note ("The jury must make its own determination [of life expectancy] based on all factors that affect the duration of life"), *citing **Pauza v. Lehigh Valley Coal Co.***, 80 A, 1126, 1127 (Pa. 1911).

Trial Court Opinion, 6/24/2019, at 16-19 (record citations and quotation marks omitted).

The trial court thoroughly explains its rationale for denying remittitur and we affirm on the basis of that analysis while adding several comments. First, it merits emphasis that large verdicts are not necessarily excessive verdicts, and each case is unique and dependent on its own special

circumstances. As noted above, Spencer suffered catastrophic injuries as a result of the accident at issue and is wheelchair bound with additional loss of function of his right arm, unable to attend to his basic daily needs, and now suffers from recurring seizures and incontinence. Furthermore, according to Dr. Fried, Spencer will require admission at an acute care facility for the rest of his life, he will need one-on-one supervision for the rest of his life, and he will require ongoing consultations with doctors over a variety of specialties during the course of his life. **See** Trial Deposition of Guy W. Fried, M.D., 9/11/2018, at 41-42. Spencer will also need ongoing medication, physical and cognitive therapies, a security system, a brain injury support day program, and testing. **See id.**, at 42-43. Lastly, it is obvious Spencer can no longer maintain employment at the bank in which he previously worked, Glenmede Trust. **See id.**, at 33.

Second, the trial court instructed the jury in detail that Spencer sought compensation for past medical expenses, future medical expenses, and noneconomic losses. **See** N.T., 1/28/2019, at 106-107. The court also instructed that if the jury found Spencer was entitled to damages for future pain and suffering, his life expectancy was an additional 26.5 years.

> According to the statistic complied by the United States Department of Health and Human Services, the average life expectancy of all persons of the plaintiff's age at the time of the incident, his sex and race was 26.5 additional years. This figure is offered to you only as a guide and you are not bound to accept it if you believe that the plaintiff will live longer or less than the average individual in his category. In reaching this decision, you are to consider the

> plaintiff's health before the incident, his manner of living, his personal habits and other factors that may affect the duration of his life.

*See id.*, at 109-110. PJB and Tina did not object to these instructions.

Third, while PJB and Tina are alleging there was no expert testimony on life expectancy, they opted to not call their own medical expert, who was scheduled to give life expectancy testimony. Moreover, Spencer did present the testimony of life care planning expert, Nurse Masterson. The expert provided testimony regarding her recommendations for medical and daily costs, which were based on the average needs of Spencer if he were to reside in a nursing facility or at home with his sister and if he lived to age of 70 and then 82. *See* N.T., 1/24/2019 p.m., at 13-50. The jury was free to believe or reject this expert testimony. *See Rettger v. UPMC Shadyside*, 991 A.2d 915, 934 (Pa. Super. 2010). Here, it obviously credited Masterson's expert testimony.

Lastly, we touch upon Tina's argument that the court erred in relying on *Helm* because that decision does not stand for the proposition that a jury's award for future medical and noneconomic damages can be sustained where the award is based solely upon a jury instruction as to the life expectancy tables, and in the absence of any life expectancy testimony by medical experts. We find her argument is misplaced. *Helm* specifically held:

> It is well settled that mortality tables are admissible in Pennsylvania for the purpose of determining a plaintiff's future damages. However, in instructing the jury on the use of such tables, the court is required to instruct the jury that certain

variables must be taken into consideration in determining the possible duration of life. The court's instructions must include a survey of such matters as sex, prior state of health, nature of daily employment, and its perils, if any, manner of living, personal habits, individual characteristics, and other facts concerning the injured party which may affect the duration of his or her life. Since mortality tables are not to be applied rigidly, failure to adequately instruct the jury on their use constitutes reversible error and warrants the grant of a new trial on the issue of damages.

***Helm***, 561 A.2d at 813 (citations omitted).

Additionally, a panel of this Court has also stated that "[w]hen such tables are submitted in a personal injury case, the jury must be permitted to consider individual characteristics that impact on the injured party's life expectancy." ***Kraus v. Taylor***, 710 A.2d 1142, 1144 (Pa. Super. 1998) (citation omitted). As indicated above, while Spencer did not present a life expectancy expert, Spencer did introduce a life care planning expert who testified to future medical and noneconomic damages based on certain life expectancy ages. Tina has not presented any case law nor does our research reveal any support for the notion that a life expectancy expert must testify before a jury can assess damages based on a certain life expectancy.

Accordingly, in light of the testimony offered by Dr. Fried and Nurse Masterson, the jury's award is supported by the record and not excessive, arbitrary or unreasonable in relation to the evidence adduced at trial. Therefore, we conclude the trial court did not erred in denying the request for a remittitur.

Judgment affirmed in part and vacated in part. Order regarding post-trial motion to mold the verdict reversed. Order regarding post-trial motion for delay damages reversed in part and affirmed in part. Case remanded with instructions. Jurisdiction relinquished.

Judge McCaffery joins the opinion.

Judge McLaughlin did not participate in the consideration or decision of this case.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/18/21